## City of Austin et al. v. Joseph Nalle.

### No. 15.

**1. Jurisdiction of Supreme Court—Construction of Constitution of the State.** — The pleadings, the evidence, and the proceedings in a case, as they are evolved from its commencement until its determination in the court of last resort, become a part of such case, and questions arising upon either may call for determination upon the final appeal. This case presents the question, whether two judges, the other being disqualified, constitute a legal court under section 11, article 5, of the Constitution of the State, in the Court of Civil Appeals. The Constitution prescribes: " When the Court of Civil Appeals, or any member thereof, shall be disqualified to hear and determine any case, the same shall be certified to the Governor, who shall immediately commission the requisite number of persons learned in the law for the trial of such case," etc. It follows, therefore, that the case involves the construction of a clause in the Constitution of the State, and that this court has jurisdiction.

**2. Disqualification of Judge of Court of Civil Appeals—Interest in the Case.**—Suit by a tax payer to enjoin the collection of a city tax, to prevent a further issue of city bonds, and to cancel bonds already issued. A judge of the Court of Civil Appeals was a property holder in the city. Such case coming to said Court of Civil Appeals, the judge was interested in the case, and so was disqualified. It is not decided whether interest in the question is a disqualification.

**3. Quorum in Court of Civil Appeals.**—Article 40 of the Act defining the jurisdiction of the Courts of Civil Appeals (Laws of 1892, page 32), prescribing that " a majority of the several Courts of Civil Appeals shall constitute a quorum for the dispatch of business," is not violative of section 6, article 5, of the Constitution creating the Courts of Civil Appeals.

**4. Two Judges of Court of Civil Appeals Constitute a Court.**—Notwithstanding the apparent literal requirement in section 11 of article 5 of the Constitution otherwise, the disqualification of one of the judges of the Court of Civil Appeals does not make requisite the appointment of a special judge, and the court composed of his two associates constituted a lawful court; and they concurring, the judgment was a determination of the case in the Court of Civil Appeals.

**5. Extent of Jurisdiction on Writ of Error.**—From articles 1043 and 1050 (Laws of 1892, page 23), it is evident that when a case shall be brought to this court by writ of error, all questions material to the determination of the case which may arise upon the appeal, and are properly presented to the court, should be decided by it; and that it should make such disposition of the appeal as the Court of Civil Appeals ought to have made.

**6. Power to Levy Tax — Construction of City Charter.** — By its charter, at the date of the issuance of the bonds in controversy, it was provided: " The mayor and city council shall have power within the city, by ordinance: First. To levy and collect an annual tax, not exceeding 1 per centum, upon all property within the limits of the city made taxable by law for State and county purposes, the money raised by said tax to be used for the current expenses, and for the general improvement of the city. Second. To raise money on the credit of the city for a special and definite purpose, by issuing bonds of the city or otherwise; provided, the bonded debt of the city shall not at any time exceed $125,000. * * * To extend the bonded debt of the city beyond the $125,000 shall only be done by a special act of the Legislature, or by the consent of two-thirds of the tax.

paying citizens voting at an election ordered for the purpose. * * * Seventh. To construct water works, gas works, and street railroads within or beyond the city limits, or both; to provide the city with water and gas. * * * Tenth. To provide for the lighting of the streets, and erecting lamps thereon." Under an election so ordering, bonds were issued for the purpose of furnishing water and light for the city, involving a necessity for a tax to meet interest and sinking fund of more than 1 per cent. *Held:*

1. That " the current expenses and for general improvement of the city," indicate the purposes for which the taxes provided in section 1 above may be applied. Such tax can not be applied to payment of interest, etc., on bonds issued under section 2.

2. " General improvement" means ordinary improvement, i. e., that which ordinarily occurs, and which may be paid for out of the revenue authorized for general purposes.

3. The words in second provision, "for a special and definite purpose," are in contradistinction to the words, " current expenses and general improvement," in the first provision. The meaning is, that for any special object for which the city is authorized to expend money—such as the supplying the inhabitants with water or lighting its streets—money may be raised by the sale of bonds.

4. The power to issue bonds given by the charter implies the power to levy a tax to discharge the debt (interest and sinking fund).

5. The Legislature not having fixed a limit in the charter, the Constitution operates to limit the rate of taxation to 2½ per centum per annum.

6. The second provision above is to be construed as if it had expressly authorized a tax to pay the interest and sinking fund of the bonds, without naming the per centum to be levied, and that it conferred upon the city the power to levy for the purposes indicated any tax within the limits fixed by the Constitution.

7. City Bonds—Negotiable Securities.—The power granted the city of Austin in its charter to raise money by issuing bonds implies the right to issue bonds having the commercial quality of negotiability. Bonds mean negotiable securities.

8. Election Upon Issuance of City Bonds—Motive of Voters.— Conceding, for the sake of argument, that we could inquire into an election held strictly according to the terms of the law, we are of opinion that we could not set it aside by reason of any fraudulent representations that may have been made to the electors in order to procure their votes. Having a plain proposition submitted to them, the voters must be presumed to know its meaning and effect, and to act at their peril; and in absence of bribery or other corrupt influence, in a proceeding affecting the validity of the election, no inquiry as to their motives can be permitted.

9. Effect of Other Ordinances. — That an ordinance was passed subsequent to the order for the election, that no bonds should be sold at less than par, and that subsequent to the election it was repealed, presents no ground of attack when the bonds were sold at 95 cents on the dollar. and bore 5 per cent interest.

10. Injunction against Act of City Council — Pleading.—It is not good pleading to allege that an act has been fraudulently done, or is about to be fraudulently done. The petition should allege specifically what is proposed to be done, so that the court may draw the legal conclusion from the facts stated, or it should be stated that the specific facts were not within the knowledge of the plaintiff.

11. Pleading—Injunction against Ordinances of City Council.— An allegation that " all the proceedings subsequent to the report of the engineer

were to carry out the scheme suggested by such report, which was taken by said council as a basis of subsequent action by said city, which report is made a part hereof," is sufficient to show that the object of the pleader was to allege that the work recommended by the engineer was the work which the council was about to perform.

12. **Work held within Scope of the Power of City Council.**—In preliminary investigations an engineer was employed by the city as an expert. The report of the engineer was made before the matter of the water and light bonds was submitted to vote. The report showed estimates for the dam across the Colorado River, and for the necessary machinery and work in furnishing water and light; showing a provision for future growth of the city; also, showing that the proposed work was greater than necessary from the present wants of the city. In an attack upon a system of water and light works based upon such report, *held*, that when a municipal body undertakes the construction of a public work within its power, courts will not interfere to control such action unless there is an undoubted excess of authority, and the abuse of the discretion lodged in the city council is palpable; and such a case is not here presented. The proposed constructions must speak for themselves, and any inquiry from other sources as to the hidden motives of the city council is not to be permitted.

13. **Power of City Council — Water and Lights — Case Adhered to.**—In this State, no city can grant an exclusive right to furnish either water or light; and that the city of Austin had a contract with another water and light company furnishes no ground for enjoining its entering upon another mode of procuring water and light. Brenham v. Water Co., 67 Texas, 542.

ON REHEARING.

14. **Disqualification of District Judge.**—The question whether or not the trial court had jurisdiction must be determined on appeal or error by the record. An objection to the district judge because disqualified to try the case, made for the first time in the Supreme Court and sought to be supported by affidavit, will not be sustained; the record showing no objection, or disqualification of the trial judge.

This is a litigation questioning the legality of the Austin city water and light enterprise, involving the construction of a dam across the Colorado River and other large expenditures by the city, and consequent heavy taxation.

Suit was brought in the District Court of Travis County by Joseph Nalle, a resident of the city and a taxpayer, against the city of Austin, the mayor and city council, and other city officers. Certain bondholders of the city were also made defendants, and relief asked against them.

The petition asks a cancellation of bonds already issued and of the ordinances under which they were issued; that the city and its officers be enjoined from the further issuance of bonds; that the work of constructing the dam across the Colorado River be enjoined; and that the city collector be restrained from collecting the so called water and light tax.

The District Court sustained a demurrer and exceptions to the petition. The plaintiff declining to amend, judgment final was rendered for the defendants. From this judgment the plaintiff appealed.

The Court of Civil Appeals held that the ordinance submitting the question of the issue of the bonds, and a subsequent ordinance, passed before the election, that the bonds should not be sold at less than their face value, should be construed together, and that the vote of the tax payers sanctioning the issue of the bonds was in nature of a contract that the bonds should not be sold at less than par, and that the terms of sale could not be altered thereafter by the city council. The court further held:

"The power of taxation is lodged in the city for public purposes. It has no authority to engage in business enterprises that are private in character, and not for a public use permitted by its charter. It is to the charter created by law that the city looks for its power to act and create a debt chargeable against the municipality, payable by taxes collected from its citizens. If the main purpose of the city is to engage in the unlawful enterprise, it can not give the illegal act life by naming it for a purpose that is lawful, and disguising the true purpose under the semblance of legal authority. Declaring the exercise of power in the given instance to be for a purpose within its charter powers does not add any validity to the illegal act. And the facts showing the true purpose may be disclosed by a tax payer whose property interest may be affected by such illegal act. For such act is not only ultra vires the city charter, but is in law a fraud upon the rights of the tax payer. The declarations made by the city council, through the ordinances authorizing the issuance of the bonds, that the purpose of building the dam was to furnish the city with water and lights, although for an apparent legal purpose, is, according to the allegations of the count in the petition quoted [hereafter given in opinion] for the main purpose of furnishing the city water power to engage in manufacturing enterprises, and that furnishing the city with water and lights is simply incidental to such main purpose. The city has no power to engage in manufacturing enterprises and devote the funds of the city to that purpose. If this be the principal purpose and object in erecting the dam and issuing the bonds, the fact that there is incidentally connected with such enterprise a purpose that is lawful will not give any life and validity to the illegal purpose; but the whole transaction is tainted with the vice of the forbidden object, and is in its entirety illegal. The courts will not endeavor to separate the legal and illegal parts of the transaction, for this would be impracticable, and a court of equity will not undertake it. * * * In the particulars discussed the averments of the petition are stated with sufficient certainty, and state a cause of action entitling appellant to relief, if the facts are as alleged. In this respect the court erred in sustaining the demurrer, and for this reason we reverse the judgment and remand the case."

While the case was pending in the Court of Civil Appeals it was shown to the court by affidavit of Associate Justice Key that he was an owner

of city property, real and personal, and was a tax payer in the city of Austin. It was held by the other judges, under section 27, page 30, of the Act of the Legislature of April 13, 1892, prescribing, that " no judge of the Court of Civil Appeals shall sit in any cause wherein he may be interested in the question to be determined," that Justice Key was disqualified from sitting in the trial of the cause. In this opinion all three of the judges concurred. The decision of the court was rendered and the judgment entered by the other two members of the court.

Motion for rehearing urged, (1) that Associate Justice Key was not disqualified, as held by the court; (2) that if disqualified, then to constitute a legal court the disqualification should have been certified to the Governor and a special judge appointed—that three judges were necessary to constitute the court; (3) that the conclusions of law upon the tenth and twelfth paragraphs of the petition were erroneous. The parts of the decision so complained of are set out above.

The motion for rehearing was overruled.

The appellees, March 7, 1893, applied for a writ of error, complaining, that " in the rendition and entry of the decisions and judgments [by the Court of Civil Appeals] upon the aforesaid questions of law, the determination of which was necessary to the decision of this cause in the Court of Civil Appeals, and which questions were properly presented to said court, manifest error, to correct which this writ of error is sought, hath occurred, in this: (1) In holding that Justice Key was disqualified. (2) In holding that the two remaining judges constituted a duly organized court, qualified to hear and determine this case. (3) In holding that said counts 10 and 12 of plaintiff's bill or petition are sufficient.

" Your petitioners further allege and show, that the questions herein presented, and which were presented to the said Court of Civil Appeals, and by it decided adversely to the contention of petitioners, involve the construction and application of the Constitution of the State of Texas, and in particular section 11 of article 5 thereof, and also involve the constitutionality and validity of the statute of April 13, 1892, in so far as said statute seeks to add other disqualifying cause or causes to those enumerated in the Constitution, and to authorize two members of a Court of Civil Appeals, where one only of the judges is disqualified, to hear and determine, as a duly organized and constitutional court, the case in which such disqualification may exist.

"And further your petitioners say, that the ruling and decision of said Court of Civil Appeals with respect to the disqualification of Associate Justice Key in effect overrules and disregards the uniform ruling and course of decision of this court under a statute exactly similar to the one in question; this court having uniformly held the judges thereof qualified to hear causes involving questions of State taxation, of homestead,

and of municipal taxation, in which members of this court, as citizens and tax payers of the State or of the municipality, were interested.''

Prayer '' that this court take jurisdiction of this cause and inquire into and by its judgment correct each and every the errors specified and complained of herein and in their said motion for rehearing.''

The opinion of the court sufficiently states the parts of the original petition drawn into discussion. The engineer Frizzell's report set out in the petition is very lengthy; its contents are sufficiently indicated in the discussion upon it.

In motion for rehearing in this court, affidavits were tendered to show that District Judge Robertson was also a tax payer in the city of Austin, and was so disqualified. The record did not show that objection on that ground had been made in the trial court.

*O. T. Holt* and *Goldthwaite,·Ewing & H. F. Ring*, for appellant.— On April 29, 1892, Joseph Nalle, an inhabitant and tax payer of the city of Austin, for himself and others similarly situated, brought this suit, which is in the nature of a bill in equity, having for its object, inter alia, the cancellation, in the hands of mala fides holders, of part of a series of negotiable bonds issued by the city of Austin, and the restraint of the city authorities from taking any steps to issue the remaining bonds of the series, or to enforce payment through taxation, as attempted, of the bonds issued or to be issued. The main grounds of attack urged are, (1) that the tax, by which it is attempted to provide for the payment of the bonds, is in excess of the taxing power or the city; and (2) that under the semblance of power, apparently lawful on the face of the proceedings, the bonds issued and to be issued are for a fraudulent purpose, utterly ultra vires of the charter authority of the city.

The defendants are the city, its officers, and acting agents, including the members of the board of public works created to further the alleged unlawful scheme, and also the holders of the issued bonds, who are alleged to hold by simulated purchase, or to have acquired the bonds with notice of the invalidating vice in them. A provisional injunction, to be perpetuated on final hearing, is prayed against these latter defendants, restraining further negotiation of the obligations.

The defendants all appeared, and urged general demurrer and special exceptions, which were sustained. The court's action upon the general demurrer rendering its ruling upon the special exceptions unimportant, the plaintiff declined to amend, whereupon final judgment was entered for the defendants; from which judgment the plaintiff has in due form appealed, and assigns error, upon which the only question arising, though it may diverge into special branches, is whether the petition states a cause of action of which the court, administering equitable relief, will take cognizance.

1. The court erred in sustaining the defendants' general and special demurrers, and dismissing plaintiff's petition, and in adjudging the costs against the plaintiff, as the petition stated a good and sufficient cause of action.

2. No necessity for implication of taxing power beyond 1 per cent exists, and the power is not expressly conferred. The second subdivision of section 1 of article 6 of the city charter merely obviates questions as to the city's debt-creating power, and its power to issue negotiable instruments, but in nowise enlarges the taxing power. The first subdivision alone deals with the taxing power, and fixes the limit at 1 per cent for current expenses and general improvement; wherefore the attempted indebtedness for the general improvement in question being beyond that for which the city could provide by taxation the requisite amount for sinking fund and interest, is ultra vires of the city's charter.

3. No power exists in a city unless conferred expressly or by necessary implication. Brenham v. Water Co., 67 Texas, 542; Williams v. Davidson, 43 Texas, 33.

4. A city has no power to issue negotiable instruments unless expressly conferred. Mayor v. Ray, 19 Wall., 468; Merrill v. Monticello, 138 U. S., 673; Brenham v. Bank, U. S., in 1892.

5. Indebtedness beyond that which may lawfully be provided for according to constitutional requirements, is void. Terrell v. Dessaint, 71 Texas, 770; Bank v. Terrell, 78 Texas, 450; County Com. v. Graham, 130 U. S., 674; Frames v. Howard County, 50 Fed. Rep., 44.

6. While section 6 of article 11 of the Constitution is self-acting as to indebtedness existing prior to April 18, 1876, yet section 5 is not self-acting in the conferring of taxing power, but merely prescribes a limitation on that power. Const., art. 11, secs. 5, 6; Voorhies v. Mayor, 70 Texas, 336; Waxahachie v. Brown, 67 Texas, 526.

7. The words " current expenses" and " general improvement" are not restricted, because no power is conferred upon the city of Austin under which it may levy taxes, except such as come within the purview of " current expenses" and " general improvement." Austin City Charter, Spec. Laws 18th Leg., p. 3, and 13th Leg., p. 215.

8. No implication of taxing power beyond the limitation expressed will be implied. United States v. Macon County, 9 Otto, 582; Dill. on Mun. Corp., 3 ed., sec. 763.

9. This case is clearly distinguishable from Werner v. Galveston, 72 Texas, 22. Sayles' Civ. Stats., art. 425a; Act of March 26, 1881.

10. The provision that the bonds should be sold only at par was in the nature of a condition precedent, or at least its violation operated a fraud in a matter most vital and material; and while the sale for less than par might not render the bonds void, it nevertheless renders them voida-

ble at the election of the defrauded tax payer while in the hands of holders mala fides, as these are.

11. Although it be conceded that inquiry by the courts will not be made into the motives of municipal authorities in the discharge of legislative functions intra vires of the city's charter, yet where, under the mere semblance of lawful authority (as the power to provide in good faith a system of water works), the city authorities fraudulently launch the city's funds and credit upon an unlawful venture, utterly ultra vires of the city's charter (as building a railroad and supplying water power for commercial gain, by the unlawful obstruction of a navigable stream, and the disastrous destruction of private property), the courts will never refuse relief; and to hold, in such circumstances, that the truth can not be shown against the municipal records, would be to deny a remedy in every instance, to belittle the power of the judiciary, and to prostrate at the feet of form the substance of the tax payer's rights. Saving Assn. v. Topeka, 20 Wall., 655; City of Ottawa v. Carey, 108 U. S., 110; Dill. on Mun. Corp., 3 ed., secs. 94, 908, 914, 915.

12. The contract by which the city is already supplied with water is presumably valid; wherefore, being provided with an ample and abundant system of water works and light, under a valid and existing contract, and having no need for a different or additional system, the city's powers in that respect are exhausted, at least pro tempore, and the attempt to provide such additional system is ultra vires and of no effect. City Charter; Turner v. Trinidad, opinion by Allen, J., and filed herewith in manuscript.

13. The right of the plaintiff to maintain this suit as brought can not be gainsaid, where the proceedings looking to expenditure of funds to be provided for by increased taxation are apparently lawful, but in fact unlawful; and where the court has thus obtained jurisdiction, it will decide as well questions going to the invalidity of the proceedings upon their face, especially where a tax for the unlawful purpose has actually been levied, and enforcement determined. Caruthers v. Harnett, 67 Texas, 129; Crompton v. Zabriskie, 101 U. S., 601; Hackett v. Ottawa, 9 Otto, 863; Valparaiso v. Gardner, 97 Ind., 1; 15 Am. and Eng. Encyc. of Law, 1140, par. 3, and authorities; Railway v. Dunn, 51 Ala., 128.

Counsel filed an argument in the Supreme Court discussing the taxing power of the city, arguing that a tax could not lawfully be imposed beyond 1 per cent.

*Geo. F. Pendexter*, City Attorney; *D. W. Doom, Fisher & Townes, W. M. Walton*, and *R. H. Ward*, for appellee.—1. The power to tax to pay the interest on and create a sinking fund for the bonds authorized by the ordinance of July 23, 1890, existed, and was ample when exercised; for

while the right to levy a tax beyond 1 per cent is not conferred by the charter in express terms, the charter nevertheless authorizes the issuance of bonds for purposes other than current expenses and general improvement of the city, and requires that provision shall be made when such bonds are issued for the interest thereof and 2 per cent on the principal as a sinking fund to redeem or pay them at maturity; and the Constitution authorizes cities of the class to which Austin belongs to levy, assess, and collect taxes up to 2½ per cent upon the taxable values of the city, and expressly requires, when any debt is created by any city, that provision for the payment of interest and the creation of a sinking fund shall be made by the levy and collection of a sufficient tax to meet the same; and the city having, by election in the manner pointed out in the charter, acquired the power to issue bonds in order to execute a public work within the power of the city to undertake, that power draws to it as a necessary incident the power within the limit stated to levy a tax to discharge the debt. Clauses 1, 2, sec. 1. art. 6, Charter, 1883, Spec. Laws, 1883, pp. 37, 38; Const. 1876, sec. 3, art. 6, secs. 5, 7, art. 11; Muller v. City of Denison, 1 Texas Ct. App., 293; Werner v. Galveston, 72 Texas, 22, 29; Gould v. Paris, 68 Texas, 511; Lufkin v. Galveston, 63 Texas, 437; 2 Dill. on Mun. Corp., 4 ed., secs. 741, 851; South. on Stat. Con., secs. 341, 343, 344; United States v. New Orleans, 98 U. S., 381; Ralls County v. United States, 105 U. S., 733; East St. Louis v. Amy, 120 U. S., 600; Scotland County Court v. Hill, 140 U. S., 41; Hitchcock v. Galveston, 196 U. S., 341; United States v. Lincoln County, 5 Dill., 184; Railway v. Scott, 116 Ill., 401.

2. The right conferred by clause 1, section 1, article 6, charter, to levy and collect an annual tax "not exceeding 1 per cent," etc., refers only to the tax to be levied and collected for "current expenses and general improvement," to which purposes it is expressly appropriated; and such grant in nowise limits or restricts the right, within constitutional limits, to levy and collect a tax to meet the interest upon and provide a sinking fund for bonds expressly authorized to be issued and sold for the execution of a "special and definite purpose," after compliance with the conditions precedent prescribed by clause 2 of said section. Bank v. City of Terrell, 78 Texas, 450; Ralls County v. United States, 105 U. S., 733; Hitchcock v. Galveston, 96 U. S., 341.

3. The right conferred upon the municipal authorities to call and hold an election for the purpose of extending, for an authorized municipal purpose, the bonded indebtedness beyond $125,000, within constitutional limits upon the taxing power, is not a delegation of legislative power, is constitutional and valid. Graham v. Greenville, 67 Texas, 62; Werner v. Galveston, 72 Texas, 27; Johnson v. Martin, 75 Texas, 39.

4. The city council is a special tribunal, whose decision on a matter within its charter powers can not be questioned in a collateral proceeding.

Charter 1883, clause 2, sec. 1, art. 6; Fort Worth v. Davis, 57 Texas, 235, 236; Dwyer v. Hackworth, 57 Texas, 250; Seay v. Hunt, 55 Texas, 558; Williamson v. Lane, 52 Texas, 335; Anderson County v. Railway, 52 Texas, 241, 242; Gibson v. Templeton, 62 Texas, 555; Werner v. Galveston, 72 Texas, 29; 1 Dill. on Mun. Corp., 4 ed., secs. 200, 204, 205; Cool. on Tax., pp. 247, 249, 250, and note 1.

5. The city council having had conferred upon it by the Legislature the right to order an election for the purpose of acquiring power to extend, for authorized municipal purposes, the bonded debt to a sum not in excess of constitutional restrictions upon its taxing powers, and having for such purpose ordered an election in conformity with charter requirements, and declared the result, the truth of the record can only be impeached in a direct proceeding, and in a collateral proceeding its verity can not be questioned.

6. The discretion and motives of the city council in issuing the bonds in question for authorized municipal purposes are not subject to judicial inquiry. Spalding v. Lowell, 23 Pick., 71; French v. Quincy, 3 Allen, 9; Worden v. New Bedford, 131 Mass., 23; Warren v. Chicago, 118 Ill., 329; Robertson v. Breedlove, 61 Texas, 321; Polly v. Hopkins, 74 Texas, 145; Waterbury v. Laredo, 60 Texas, 523; 1 Dill. on Mun. Corps., 4 ed., secs. 94, 311; 2 Dill. on Mun. Corps., 4 ed., sec. 601; 2 High on Injunc., secs. 1186, 1240, 1247; Cool. on Tax., pp. 247–250, and note; 7 Laws. Rights, Rem. and Prac., sec. 3927, and note; Doyle v. Ins. Co., 94 U. S., 535; Oglesby v. Attrill, 105 U. S., 609; Kaukauna v. Canal, 142 U. S., 274; Minnesota v. Barber, 136 U. S., 320; Soon Hing v. Crowley, 113 U. S., 710; East St. Louis v. Zibley, 110 U. S., 324; Coulson v. Portland, Deady, 481; Trust Co. v. Railway, 39 Fed. Rep., 154; Fellows v. Walker, 39 Fed. Rep., 651; Alpers v. San Francisco, 32 Fed. Rep., 505; Green Bay v. Kaukauna, 35 N. W. Rep., 529; Attorney General v. Eau Claire, 37 Wis., 400; Des Moines v. Gas Co., 44 Iowa, 505; Muskegon v. Terrent, 47 Mich., 115; Boyd v. Mayor, 19 N. J. Eq., 383; Lucia v. Montpelier, 15 Atl. Rep., 321; Bates v. Bassett, 15 Atl. Rep., 200; Bell v. Plattsville, 36 N. W. Rep., 851; Handy v. New Orleans, 1 So. Rep., 593; Connery v. Water Works, 7 So. Rep., 8; Freeport v. Marks, 59 Pa. St., 253; Buell v. Ball, 20 Iowa, 232.

7. The debt alleged by complainant to be due the sinking fund of former bonds is no part of the bonded debt or of any other debt. Principal and sinking fund are not to be added for the purpose of determining the amount of the bonded debt. The principal is the same, and the sinking fund is but a credit; if sinking fund is not created, the debt does not exist—that's all. The bill, if true, shows that there has been sufficient money realized annually through taxation, which has been unlawfully diverted. If proper provision for the interest and sinking fund was made

at the time, that is sufficient.    Bank v. Terrell, 78 Texas, 457; Dwyer v. Hackworth, 57 Texas, 251.

8.  If the averments of the bill be taken as true, it shows on its face that the provision made for the entire bonded debt of the city is sufficient without going to the limit of authorized taxation ($2\frac{1}{2}$ per cent) to pay the interest on former bonds and on the bonded debt now existing by virtue of the ordinance of July 23, 1890.

9.  No debt of $1,400,000, under the ordinance of July 23, 1890, exists. There is no debt, under the terms of said ordinance, until the bonds are issued, sold, delivered, etc., and the Constitution is satisfied if the taxable values are sufficient, when the debt is created, to produce, through the exercise of the taxing power, within prescribed limits, a sum sufficient to pay the interest and 2 per cent of the sinking fund.   A debt of $900,000, not of $1,400,000, existed for 1892.    Bank v. Terrell, 78 Texas, 450;. Electric Co. v. Newton, 42 Fed. Rep , 723.

10.  The city council is clothed with legislative and governmental powers, and may amend, modify, or repeal ordinances enacted, when such repeal violates no contract or vested right.    It also has control of the fiscal affairs of the city, subject to the terms of the charter.    It can not enact irrepealable ordinances or resolutions.    Charter of city of Austin, Spec. Laws 1883, pp. 36–45.

11.  The ordinance of April 3, 1890, providing for the creation of a board of public works, etc., has no connection whatever with the election ordinance, the proclamation, the election, or the declaration of the result thereof; and it was and is subject to modification, amendment, or repeal by the city council, and so also is the ordinance of October 8 repealing it.    There is no necessary relation between these ordinances and the conferring of the power to extend the bonded indebtedness of the city by the vote of the tax payers; and it is not competent for the court to look to these ordinances and extrinsic testimony for the purpose of ascertaining the motive inducing the voters to vote for the extension.

12.  Any provision in the ordinance of October 8, 1890, requiring bonds to be sold at par, is repealed by the ordinance of April 9, 1892, repealing section 4 of the ordinance of July 23, 1890.    1 Dill. Mun. Corp., sec. 314, and note, to the effect that a provision in an ordinance that is plainly repugnant to an ordinance previously adopted repeals the first to the extent of the repugnancy; citing Ex Parte Wolf, 14 Neb., 24; Burlington v. Estlow, 43 N. J. Law, 13.

13.  The fact that bonds are payable in gold in nowise affects their validity and gives plaintiff no right to relief by injunction.    University of Alabama v. Moody, 62 Ala., 389; 79 Am. Dec., 330; Whittaker v. Johnson County, 10 Iowa, 61; Meyer v. Muscatine, 1 Wall., 389; Yesler v. Seattle, 25 Pac. Rep., 1014; Memphis v. Bethel, 17 S. W. Rep., 191.

14.  A sale below par was an exercise of discretion by the city council,

and was permitted by ordinance.  Plaintiff had no contract right in the ordinance which could control or restrict future legislative action.  In the vote conferring the power there was no requirement that the bonds should be sold at not less than par; and the execution of the power being vested in the council, it had the right to ordain that the bonds might be sold for less than par.  University of Alabama v. Moody, 62 Ala., 387; Brown v. Memphis, 20 Wall.; Yesler v. Seattle, 25 Pac. Rep., 1014.

15.  The general rule is, that corporations upon whom is conferred power to give securities may exercise such power in the same mode and manner as natural persons may under similar circumstances, there being no legislative restriction nor specification of a particular mode.

16.  The allegation that the city, at the time of the authorization of the bonds in question, had, by contract with a private corporation, an ample water and light supply, and had exhausted its authority to make other or different provision therefor, is immaterial; but if material, is a mere statement of a legal conclusion—neither the alleged contract nor other fact being stated from which the court might draw its conclusion. Hopper v. Covington, 118 U. S., 151; Pumpelly v. Green Bay Co., 13 Wall., 166; Cragin v. Lovell, 109 U. S., 194; Brenham v. Water Co., 67 Texas, 542; 42 Fed. Rep., 723; 7 So. Rep., 11; 15 Atl. Rep., 581.

## ON MOTION FOR REHEARING IN COURT OF APPEALS.

By an affidavit filed in this court by Associate Justice Key, and made a part of the record in this case, and which is referred to in the opinion herein, it appears that he is a resident citizen and tax payer of the city of Austin, owning within the limits of said city real and personal property subject to taxation; and this court, with the concurrence of Justice Key, holds that this disqualifies him to sit in this cause under section 27 of the Act of April 13, 1892.

Against this ruling and decision we maintain:

First.  That being a resident citizen and tax payer of the city of Austin does not disqualify Justice Key.

Second.  That if he is disqualified, for such or other reason, and was disqualified when the decision herein was rendered, then that the judgment rendered by the two remaining members of this court was without authority of law and void; the disqualification of Justice Key not having been certified to the Governor and his place filled, as imperatively commanded by the Constitution.  Citing: McFaddin v. Preston, 54 Texas, 403; King & Davidson v. Sapp, 66 Texas, 519; Pasch. Dig., art. 1578; Rev. Stats., art. 1040; Hart. Dig., art. 878; Railway v. The State, 75 Texas, 356; Railway v. Anderson County, 59 Texas, 654; Railway v. Smith, 65 Texas, 167; Red v. Johnson, 53 Texas, 284; Cassiano v. Ursuline. Academy, 64 Texas, 673; Rosenberg v. Weekes, 67 Texas, 578;

Court v. O'Connor, 65 Texas, 334; Hardesty v. Fleming, 57 Texas, 400; The State v. Baker, 49 Texas, 763; Railway v. Harrison County, 54 Texas, 119; Nelson v. Edwards, 55 Texas, 389; The State v. Middleton, 57 Texas, 185; Cordray v. The State, 55 Texas, 141; Swan v. The State, 48 Texas, 121; Cattle Co. v. Faught, 69 Texas, 402; Chisholm v. Adams, 71 Texas, 678; Daugherty v. Thompson, 71 Texas, 192; Malone v. Kornrumpf, 84 Texas, 454; Williams v. Willis & Bro., 84 Texas, 398; Bateman Bros. v. Pool, 84 Texas, 405; Wynne v. Hudson, 66 Texas, 1; 66 Texas, 295; 57 Texas, 674; Cockrell v. Curtis, 83 Texas, 105; Cameron v. Morris, 83 Texas, 14; Blum v. Light, 81 Texas, 414; Zwernemann v. Von Rosenberg, 76 Texas, 522; 76 Texas, 664; Austin v. Gas Co., 69 Texas, 180; Voorhies v. Mayor, 70 Texas, 331; Fort Worth v. Davis, 57 Texas, 225; Dwyer v. Hackworth, 57 Texas, 245; Perry v. Rockdale, 62 Texas, 451; Werner v. Galveston, 72 Texas, 22; Norris v. Waco, 57 Texas, 635; Cave v. Houston, 65 Texas, 619; Cleburne v. Railway, 66 Texas, 457; Waxahachie v. Browne, 67 Texas, 519; Gould v. Paris, 68 Texas, 511; Terrell v. Dessaint, 71 Texas, 770; Bank v. Terrell, 78 Texas, 450; Galveston v. Loonie, 54 Texas, 517; Lufkin v. Galveston, 63 Texas, 437; Labadie v. Dean, 47 Texas, 90; Dean v. Lufkin, 54 Texas, 265; Wharf Co. v. Galveston, 63 Texas, 14; City Co. v. Galveston, 56 Texas, 486; Galveston v. Gorham, 49 Texas, 279; Gas Co. v. Galveston, 54 Texas, 287; Slaven v. Wheeler, 58 Texas, 26; Redmond v. Tarboro, 7 L. A. R., 540.

Counsel also filed an argument supporting the jurisdiction of the Supreme Court.

GAINES, Associate Justice. — This case comes to us upon a writ of error to the Court of Civil Appeals for the Third Supreme Judicial District, by which it is sought to review a judgment of that court reversing the judgment of the trial court, and remanding the cause for a new trial.

Mr. Justice Key held himself disqualified to sit in the cause, and the judgment which is here sought to be reversed was rendered by the two other members of the court. After that judgment was rendered, the appellees, who are plaintiffs in error in this court, filed a motion for a rehearing, upon the ground, among others, that the two judges who sat in the case did not constitute a legal court, and that their action was therefore coram non judice and void. In this motion for a rehearing it was also urged, that the court erred in its ruling upon the merits of the cause.

The errors alleged in the motion for a rehearing are made the basis of the application of the writ of error.

We have first to determine whether or not we have jurisdiction of the cause. The judgment of the Court of Civil Appeals being one which reversed the judgment of the trial court and remanded the cause, this court has no power to review it, unless the case comes under some one of the

eight exceptions specified in article 1011a, which was made a part of the Revised Statutes by the act approved April 13, 1892, which defined the jurisdiction of the Supreme Court. Laws 1892, p. 20. It is not claimed that the case, as originally presented in the Court of Civil Appeals, comes under any one of the first seven exceptions, or that the disposition of it in that court "practically settled the case." But it is insisted, that the questions which arose in the case after it reached the appellate court, and which grew out of the supposed disqualification of one of the judges, involved the construction of the Constitution of the State, and that therefore this court had jurisdiction to review the entire case upon a writ of error.

That the question of the legality of the court, as constituted by two of its members only, involves the construction of the Constitution as well as the validity of a statute of the State, there can be no doubt. But whether the Legislature intended to confer jurisdiction upon this court when the constitutional question does not arise upon the merits of the case, but grows out of some matter of procedure in the Court of Civil Appeals, is not so easy to determine.

But from the commencement of every suit until its final termination questions of procedure may arise which may materially affect the result of the suit, but which are in no way involved in the intrinsic merits of the case. When such a question has been erroneously decided in the trial court, the decision may be reversed in the Court of Civil Appeals, and the error may demand a reversal of the judgment. If, however, that court should affirm the judgment, notwithstanding such error, this court, in a case in which that court's judgment is not made final by statute, would have jurisdiction to revise such error and to render such judgment as that court ought to have rendered.

For example, the question whether a charge is upon the weight of the evidence is not one involved in the issues made by the pleadings in the case, but it is one that affects the legal right of the parties, and if answered in the affirmative might be a ground for a reversal of the judgment in any court to which the case should be appealed.

So also, a question of procedure may spring up in a Court of Civil Appeals. For example, the point may be there made, that an alleged error of the trial court has not been properly assigned. Is it to be doubted that this court would have the power, in a proper case, to revise the decision by the tribunal of such a question, and to reverse its ruling if found erroneous? If not, can such a question be distinguished from that now under consideration? Neither arises in the trial court; and if the question of a legal assignment of error be important, the question of a legally constituted tribunal to pass upon the appeal must be more so, because it affects the very life of any judgment that the court may render. If the judgment had been affirmed by the Court of Civil Appeals, and the

question whether or not a lawful quorum participated in the decision had been presented to this court in a proper manner, we could not have evaded the responsibility of deciding the question.

The pleadings, the evidence, and the proceedings, as they are all evolved in the progress of the cause from its commencement until its determination in the court of last resort, become a part of the case, and questions arising upon either may call for determination upon the final appeal. It follows, that the case we have involves the construction of the Constitution of the State, and that it comes literally within the second exception to the article of the statute above cited.

Having determined that we have jurisdiction, we come next in order to the question of Judge Key's disqualification. It was made a ground of the motion for rehearing filed in the Court of Civil Appeals, that Judge Key was qualified and should have participated in the decision of the cause. In passing upon that motion the court, as constituted by the other two judges, held the contrary, upon the ground that he owned property in the city of Austin subject to taxation, and was therefore interested in the question of the legality of the tax to be determined by this suit. This conclusion involves the further holding, that section 27 of the act to define the jurisdiction of the Courts of Civil Appeals, approved April 13, 1892, which prescribed an interest in the question as an additional ground of disqualification of a judge, was not in conflict with section 11 of article 5 of the Constitution as recently amended, which did not prescribe such interest as a disqualification.

Judge Key was undoubtedly interested in the question at issue before the court. But whether section 11 of the article of the Constitution just mentioned was not intended fully to define every ground of disqualification of a judge, and to take from the Legislature all power to prescribe additional grounds, is a grave question. It is one, however, which we do not deem it necessary to determine.

This suit was brought by a property holder and tax payer of the city of Austin, to enjoin the collection of certain taxes for the years 1891 and 1892, which had been assessed for the purpose of paying the interest and sinking fund upon certain bonds, which it was claimed had been issued by the city for an illegal purpose. But in addition to the injunction against the taxes, the plaintiff also sought to cancel the bonds so issued, and to restrain the issue of other bonds for the same purpose.

The bonds already issued were alleged to amount to the sum of $900,-000. The sum of the bonds the issue of which was sought to be enjoined was $500,000. If the latter obligations should be issued, they would, prima facie at least, authorize the assessment and collection of a tax upon all taxable values in the city for their payment. If their issue should be restrained, no such tax could be levied. It follows, therefore, as we think, that every holder of property in the city which is subject to tax-

ation, has not only an interest in the question to be determined by the suit, but also a direct pecuniary interest in the result.

Judge Key being the owner of taxable property in the city, was, in our opinion, disqualified to sit in the case. He was "interested" in the case, and was prohibited from sitting by section 11 of article 5 of the Constitution. Without expressing either our concurrence or our disapproval of the ground upon which the Court of Civil Appeals placed their ruling, we conclude that their decision of the question was correct.

But it is further insisted on behalf of plaintiff in error, that if Judge Key was disqualified, the two remaining judges did not constitute a lawful court. The contention of counsel is, that under the provisions of the amended section 11 of article 5 of the Constitution, when one member of the Court of Civil Appeals is disqualified to sit in a cause the fact should be certified to the Governor, and that he shall then appoint a special judge to aid in its disposition; and that until this is done the other two members of the court have no power to proceed with the case. Still another reason for holding that two judges of the Court of Civil Appeals can not constitute a court for the transaction of its business, has suggested itself to our minds, and though not urged by counsel, in view of the importance of the matter we deem it proper to dispose of it. It is involved in the main question immediately under consideration, and affects the right of any two members of any Court of Civil Appeals in this State to hold a session of the court when the other is absent, from any cause whatever. We shall dispose of the latter question first.

Section 2 of amended article 5 of the Constitution contains this provision: " The Supreme Court shall consist of a chief justice and two associate justices, any two of whom shall constitute a quorum; and the concurrence of two judges shall be necessary to a decision of a case."

Section 4 reads in part as follows: " The Court of Criminal Appeals shall consist of three judges, any two of whom shall constitute a quorum; and the concurrence of two judges shall be necessary to a decision of said court."

Section 6, however, simply declares, that the Legislature shall divide the State into districts, " and shall establish a Court of Civil Appeals in each of said districts, which shall consist of a chief justice and two associate justices," etc., and does not prescribe the number requisite to constitute a quorum.

The provision as to a quorum in the Supreme Court and in the Court of Criminal Appeals, and the absence of a similar provision with reference to the Courts of Civil Appeals, is, to say the least of it, remarkable. The sections referred to were parts of an amendment to the Constitution which were passed by the two branches of the Legislature and submitted to the people as a whole. Under these circumstances, the failure to provide that two members of a Court of Civil Appeals should make a quo-

rum strongly tends to evince the intention that every case in that court should be decided by a full bench. There are authorities which hold, as to special tribunals at least, that when a court is created composed of more than one judge, and the law creating it does not prescribe that any number less than the whole may constitute a quorum, all must act in making a decision. Whether this rule should apply to superior courts may well be doubted.

Section 40 of the act defining the jurisdiction of the Courts of Civil Appeals, approved April 13, 1892, does provide, that "A majority of the several Courts of Civil Appeals shall constitute a quorum for the transaction of business." Laws 1892, p. 32. If this provision was not prohibited by the Constitution, it settles the question; and notwithstanding the considerations which indicate that it was the purpose of section 6 of article 5 as amended to require all the members of each Court of Civil Appeals to act together in the transaction of its business, we feel constrained to hold, that it was not intended to deprive the Legislature of the power of establishing a different rule.

The amended article 5 was adopted in order to secure a prompt disposition of causes which had been and which should be appealed from the trial courts. It had been found wholly impracticable to accomplish this under the original article 5 of the Constitution. To secure this end, the Courts of Civil Appeals were established. It was evidently contemplated that as many as three might be necessary at the time of its adoption, and that even the three first established might be found inadequate. The great number of cases now pending in the three courts already created, and the recent Legislature providing for the establishment of two in addition to those now existing, indicate that it required no great powers of prophecy to foresee the probable contingency that the new courts would be burdened with more labor than they would be able to perform. Looking then to the result of a rule which would require the presence of all the judges to constitute a court, upon the dispatch of its business, we can not believe that such was the intention of the Legislature who passed the amendment, or of the people who voted for its adoption.

It is to be borne in mind that no provision is made for the appointment of a special judge when one of the judges is merely absent. Hence, if it should be held that a full bench is necessary to make a quorum, the result would be, that in the event of the absence of one of the judges by reason of sickness or from any other cause, the business of the court would remain in suspense until the absent member should be present. Such a rule would be fraught with mischief, and would tend to obstruct the accomplishment of the very purpose for which the Courts of Civil Appeals were created. In this connection, it is to be noted that the same Legislature which passed the amendment passed the act providing that two members

of the court should be a quorum. Their construction of the constitutional question, unless clearly erroneous, should be upheld.

We recur then to the ground on which counsel for plaintiffs in error base their argument, that the two members of the Court of Civil Appeals who rendered the judgment here sought to be set aside were not a lawfully constituted court. They maintain, that amended section 11 of article 5 of the Constitution imperatively requires, that when one of the judges of any one of the higher courts is disqualified, the fact shall be certified, and the Governor shall appoint a special judge in his stead; and they further contend, that the intent becomes more manifest when that section is construed in connection with the section for which it was substituted. The following is a copy of so much of original section 11 of article 5 of the Constitution of 1876, as applies to the judges of the Supreme Court and of the Court of Appeals:

" No judge shall sit in any case wherein he may be interested, or where either of the parties may be connected with him by affinity or consanguinity within such degree as may be prescribed by law, or where he shall have been counsel in the case. When the Supreme Court, or the appellate court, or any two of the members of either, shall be thus disqualified to hear and determine any case or cases in said court, the same shall be certified to the Governor of the State, who shall immediately commission the requisite number of persons learned in the law for the trial and determination of said cause or causes.''

The section as now amended reads, in part, as follows:

" No judge shall sit in any case wherein he may be interested, or when either of the parties may be connected with him either by affinity or consanguinity within such a degree as may be prescribed by law, or when he shall have been counsel in the case. When the Supreme Court, a Court of Criminal Appeals, the Courts of Civil Appeals, or any member of either, shall be thus disqualified to hear and determine any case or cases in said court, the same shall be certified to the Governor of the State, who shall immediately commission the requisite number of persons learned in the law for the trial and determination of such cause or causes.''

In brief, the former says, that when any two members of the court are disqualified the Governor shall commission the requisite number of lawyers to try and determine the cause; the latter provides, that he shall appoint the requisite number if but one member of the court be disqualified. Upon first blush the literal terms of the amendment would seem to demand, and the fact of the change would indicate, that in any case in which a judge was recused a special judge should be appointed. But this construction, when the section in question is compared with other provisions in the amendment, leads to a manifest incongruity.

We should bear in mind, that section 11 applies in express terms to the Supreme Court and to the Court of Criminal Appeals. The amendment

in terms equally clear, provides that two members of either of these courts shall constitute a quorum.  So that if it should be held, that the Governor should appoint a special judge in every case in which a member of either of these two courts should be disqualified, the remaining two could not act, although they could make a decision if that member was merely ab-·sent, or saw fit from any cause not to take part in the decision of the case.

No reason suggests itself to us for such a distinction.  Why, if two members of the court make a quorum, should a third be appointed in a case in which the two may concur in a decision? There can be none. But there is a necessity for an appointment when the two judges who are qualified may disagree.

This suggests the consideration which, as we think, led to the change in the section under consideration.  Under the original section a special judge could be appointed only when two members of a court were dis-qualified; and hence there was no provision to meet the case when one was disqualified and the other two failed to concur as to the decision of the case.  The amended section obviates this difficulty by providing for an appointment when only one is disqualified.

It does not follow that an appointment is to be made in every such case.  The requirement is, that the Governor "shall commission the requisite number  * * *   for the trial and determination of such cause."  If three were required to make a quorum, then one being dis-qualified, another would be necessary to make the requisite number to decide the cause.  So also, if one be disqualified and the other two disa-gree, the appointment of a special judge is requisite to enable the court to make a decision, although two may constitute a quorum.  But if two be a quorum, and two be qualified and able to agree, no additional judge is requisite to a decision of the case, although the third member of the court be recused.

. So construed, we see a satisfactory and sufficient reason for the change made by the amendment.  Construed as requiring the appointment of a special judge in every case in which one member of either of the courts is disqualified, we perceive no sound reason for the departure from the previous law.  Though not strictly repugnant to those provisions which make two members, either of the Supreme Court or of the Court of Crim-inal Appeals, a quorum to transact business, such a construction does not accord with their spirit. .

We conclude, therefore, that the disqualification of Judge Key did not make requisite the appointment of a special judge, and that the court composed of his two associates constituted a lawful tribunal for the trial and determination of the case.

Having acquired jurisdiction of the case, by reason of the constitu-tional question which involves the power of two members of the Court of Civil Appeals to render a judgment, the further question arises whether

we should retain jurisdiction for the purpose of disposing of the case upon its merits.

Article 1043 of the Revised Statutes, as amended by the Act approved April 13, 1892, provides, that "in each case the Supreme Court shall affirm the judgment, reverse and render the judgment which the Court of Civil Appeals ought to have rendered, or reverse the judgment and remand the cause to the lower court, if it appears that the justice of the case demands another trial." Laws 1892, p. 22.

Article 1050 also provides, that "all mandates from the said court shall issue to the court in which the original judgment was entered." Laws 1892, p. 23. It is evident from these provisions that it was the intention of the Legislature, that when a case should be brought to this court by a writ of error, all questions material to the determination of the case, which should be raised upon the appeal and properly presented to this court, should be decided by it, and that it should make such disposition of the appeal as the Court of Civil Appeals ought to have made. There is no express provision in the statute which authorizes this court to send its mandate to the intermediate court in any case brought here by a writ of error; and it could not have been contemplated that we should issue such writ to the trial court, with instructions to follow the opinion of the Court of Civil Appeals, unless we should concur in their opinion upon the meritorious questions in the case. The purpose of the Legislature in restricting the right to a writ of error to this court in cases which should be remanded by the Courts of Civil Appeals, was mainly to enable this court to make a prompt disposition of the business which should be brought before it. It is not more difficult to decide a case of that class than to determine one in which the judgment has been affirmed; and it is certainly expedient that the court should decide every question properly raised in every case which reaches it by a writ of error. We therefore conclude, that it is our duty to consider the whole case, to dispose of every question that has been presented to us, and to render a judgment, either reversing or affirming the judgment of the trial court, as the law may demand.

The District Court sustained a demurrer to the petition, and the plaintiff declining to amend, the judgment was made final against him. From this judgment he appealed to the Court of Civil Appeals, and assigned the ruling of the court upon the demurrers as error. There are sundry grounds set forth in the petition, upon which it is claimed that the bonds in controversy are not authorized by the charter of the city, and are therefore void. Such as are urged in the brief of the appellant in the Court of Civil Appeals, we shall dispose of in the order in which they are there presented.

The allegations in the petition show, that in order to meet the current expenses of the city government and the interest and the 2 per cent for

the sinking fund of ·the existing bonded indebtedness, and in like manner to pay the interest and 2 per cent upon the bonds in controversy, will require a tax upon the taxable values of the city of more than 1 per cent; and it is insisted that 1 per cent is the limit of taxation authorized by the city charter.　If this proposition can be maintained, it is decisive of the case in the plaintiff's favor.

In order for a city in this State to create a bonded indebtedness, the power must be conferred by statute.　Section 5 of article 11 of the Constitution empowers the Legislature to confer authority upon a city having more than 10,000 inhabitants to levy and collect a tax not to exceed $2\frac{1}{2}$ per cent of the taxable property of the city; and provides also, that "no debt shall ever be created by any city unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest thereon and create a sinking fund of at least 2 per cent thereon."　This does not confer authority upon a city to create a bonded indebtedness. It merely authorizes the Legislature to grant the power, and prescribes a limitation upon the grant.　Its purpose was to fix a limit upon the power of taxation for municipal purposes, and to hedge it about with salutory restrictions.

At the time the city council passed the ordinance which provided for· the issue of the bonds in controversy, the city was governed by virtue of a special charter.　Its charter was amended by an act approved April 17, 1883.　This amendment contained the following provisions:

"The mayor and city council shall have power within the city, by ordinance:

"First.　To levy and collect an annual tax, not exceeding 1 per centum, upon all property within the limits of the city, made taxable by law for State and county purposes, the money raised by said tax to be used for the current expenses and for the general improvement of the city.

"Second.　To raise money on the credit of the city, for a special and definite purpose, by issuing bonds of the city, or otherwise; provided, the bonded debt of the city shall not at any time exceed $125,000, and, the interest due on bonds and interest bearing warrants issued by the city of Austin, with the interest accrued thereon, shall be at all times considered a part of the bonded debt of the city.　To extend the bonded debt of the city beyond $125,000 shall only be done by a special act of the Legislature, or by the consent of two-thirds of the tax paying citizens, voting at an election ordered for the purpose, after thirty days notice by the mayor, by the authority of and in the method that may be prescribed by the city council.　All bonds shall specify for what purpose they were issued; and when any bonds are issued by the city, a fund shall be provided to pay the interest, and 2 per cent per annum on the principal as a sinking fund to redeem the bonds, or pay them at maturity; and said sinking fund shall not be diverted to or drawn for any other purpose,.

and the city treasurer shall honor no draft drawn on said sinking fund, except to pay the interest or redeem the bonds for which said fund was provided. The sinking fund for the redemption of any bonds, and the payment of the interest thereon, shall be invested, as fast as the same accumulates, in interest bearing bonds of the United States, or of the State of Texas, or of the city of Austin, as the city council may deem most advantageous; and such bonds and the interest thereon shall be sold when necessary to pay or redeem the bonds for which the sinking fund was established.

"Seventh. To construct water works, gas works, and street railroads, within or beyond the city limits, or both; to provide the city with water and gas, and to erect hydrants, fire plugs, and pumps in the streets; to erect the necessary machinery, lamp posts, etc., for lighting the city, within or beyond the limits of the city, for the convenience of the inhabitants of the city and environs.

"Tenth. To provide for the lighting of the streets and erecting lamps thereon."

It is insisted that the words "general improvement" were intended to include all improvements of every character, and that therefore that the tax of 1 per cent was intended to cover the expenses of the city for every purpose whatever. But we do not concur in this construction. The second section clearly confers the power to issue interest bearing bonds, which would require an annual outlay to pay interest and installments applicable to a sinking fund. That the money to be raised by the 1 per cent tax was not to be appropriated to such a purpose is made clear by the distinct statement of the definite objects to which it should be applied. It is to be used "for the current expense and general improvement of the city." The meaning is, that the money is to be directly applied to these purposes; and it does not mean that it is to be appropriated to the payment of the interest and sinking fund of a bonded indebtedness, although such indebtedness may have been created for the improvement of the city.

In our opinion, the words "general improvement" mean ordinary improvement—that is, the improvement which ordinarily recurs, and which may be paid for out of the revenue which was authorized to be raised for general purposes. This is made more manifest by the second provision. It authorizes the city to raise money by the issue of bonds "for a special and definite purpose." The words quoted are clearly used in contradistinction to the words "current expense and general improvement" in the first provision. The meaning is, that for any special object for which the city is authorized to expend money, such as the supplying of inhabitants with water or lighting its streets, money may be raised by the sale of bonds.

Now, it may be conceded that the power of levying a tax must be

given either expressly or by necessary implication, and that every reasonable doubt as to the grant should be resolved in favor of the tax payer. But we have seen that the only tax which was expressly authorized was by express direction to be applied to other purposes. We have also seen, that the Constitution requires, that whenever a bonded indebtedness is created by a city, provision must be made by taxation for the payment of the annual interest and an annual installment of a sinking fund. Therefore the power to issue bonds given by the city's charter implies the power to levy a tax to discharge the debt. It has been so held by the Supreme Court of the United States. Ralls County Court v. United States, 105 U. S., 733; United States v. New Orleans, 98 U. S., 381.

The Legislature not having placed a limit on the tax, that fixed by the Constitution is to be applied. The Constitution forbids the Legislature from granting the power to levy a tax of more than $2\frac{1}{2}$ per cent, but does not require that the limit shall be named. As to the limit of the taxation, the Constitution executes itself, with or without legislation. We think, therefore, that the second provision in the section quoted from the city's charter is to be construed as if it had expressly authorized a tax to pay the interest and sinking fund of the bonds, without naming the per centum to be levied, and that it conferred power upon the city to levy for the purposes indicated any tax within the limits fixed by the Constitution.

But it is also urged, that the city was not authorized to issue negotiable bonds, and that for the reason that the bonds in controversy are negotiable in form, they are therefore without authority and void. Does the charter of the city confer authority upon the council to issue negotiable securities? It clearly has the power to raise money by issuing bonds.

In Amy v. The Mayor, etc., 24 Howard, 364, the Legislature of Pennsylvania had authorized Alleghaney City to subscribe to the stock of a certain railway company, and to issue "certificates of loan" therefor. The city subscribed to the stock, and issued in payment what is now known as negotiable bonds. The court held that the bonds were valid, and were not subject to be attacked for irregularity in the hands of a bona fide transferree. Speaking of the certificates of loan, the court say: "Such certificates are well and distinctly known and recognized in the usages and business of lending and borrowing money, in the transactions of commerce also, and for raising money upon the contract in them, for industrial enterprises and internal improvements. They were formerly more generally known than otherwise as 'certificates of loan,' with certificates of interest attached, payable to bearer at particular times within the year, at some particular place, being a part of the contract, from which they must be cut off to be presented for payment. But now in their use they are called bonds with coupons for interest—a coupon bond; coupons being interest payable, separable from the certificate of loan, for the purpose of

receiving it.    But neither the instrument nor the coupon has any of the legal characteristics of a bond, either with or without a penalty, though both are written acknowledgments for the payment of debt." There, although the authority given was merely to issue "certificates of loan," the court assumed to know that negotiable certificates, such as are now known as negotiable bonds, were meant, and held them binding obligations.

In Hackett v. Ottawa, 99 United States, 86, the power delegated to the council of the city was, "to borrow money on the credit of the city, and to issue bonds therefor, and to pledge the revenues of the city for the payment thereof." Bonds of the city, negotiable in form, were issued really to aid in the development of manufacturing enterprises, but they appeared upon their face to have been issued for lawful municipal purposes. The court, all the judges concurring, held, that an innocent holder was entitled to recover upon the bonds.

In Ottawa v. The Bank, 105 United States, 342, other bonds of the same issue came in question, and the ruling in the previous case was adhered to without dissent.

In Ottawa v. Carey, 108 United States, 110, there was an attempt to recover upon still other bonds of the same series.    It was held unanimously that the plaintiff was a mala fide holder, and could not recover.

The opinion in neither case discusses the question whether the power "to issue bonds" authorized an issue of negotiable bonds. But the decision in two former cases necessarily rests upon the affirmative of the proposition—namely, that the word "bonds" means negotiable securities.

In Hackett v. Ottawa, the power of the council to make the bonds negotiable is expressly recognized; while in Ottawa v. The Bank, the court say, that they had decided in Hackett's case that "the city council had power, the voters consenting, to issue negotiable securities for certain municipal purposes."

A municipal bond, in its ordinary commercial sense, means a negotiable bond. Hence, if the Legislature intended to authorize the city council of Austin to issue mere evidences of debt, why did they use the word "bonds?" The word implies something more than mere promises to pay; that is to say, it implies bonds having the commercial quality of negotiability. .

Money may be borrowed by a city upon a nonnegotiable instrument, but in order to obtain advantageous terms, and to enter the markets of the world in fair competition for the use of money, it must issue commercial paper.

The power to issue bonds was granted to the city of Austin for the purpose of enabling it to raise money, and it is not to be presumed that

it was intended to restrict the power to the issuing of obligations that would not be effective for the purpose and advantageous to the city.

In Brenham v. The Bank, 144 United States, 173, the Supreme Court of the United States has recently held, that the mere power to borrow money does not authorize a municipal corporation to issue negotiable bonds in payment therefor. In that case the court say: " The confining of the power in the present case to a borrowing of money for general pur-; poses on the credit of the city, limits it to the power to borrow money for ordinary governmental purposes, such as are generally carried on with revenues derived from taxation; and the presumption is, that the grant of the power was intended to confer the right to borrow in antici-pation of the receipts of revenue taxes, and not to plunge the municipal corporation into a debt on which interest must be paid at 10 per centum per annum semi-annually for at least ten years.'' But the correctness of the conclusion in that case we need neither affirm nor deny.

The case is distinguishable from this in two important particulars. Here the power to issue bonds is expressly conferred, and, as we have seen, the bonds could not be made a charge upon the revenues collected for general purposes. It was clearly contemplated that a special tax should be levied for their payment. In the opinion in the case cited, the court also use this language: ''Although the authority for such bodies to issue nego-tiable paper might be implied in some cases, from other and express pow-ers granted, these implications should not be extended beyond the fair inferences to be gathered from the circumstances of each case.'' From the powers granted to the city of Austin and the circumstances of the case, we think it fairly inferable that the Legislature intended to give it authority to issue negotiable bonds; and we are of opinion that it should be so held.

As averred in the petition, by virtue of an ordinance of the city coun-cil, the question of issuing bonds to the amount of $1,400,000 was sub-mitted to the tax payers of the city at an election, and the proposition was carried by the requisite two-thirds vote. It is alleged, however, that between the date of the ordinance ordering the election and the elec-tion itself, the city council passed another ordinance creating a board of public works, in which it was provided that the bonds which were pro-posed to be issued should not be sold at less than par.

It is also averred, in effect, that after the election this provision was repealed, and that the bonds were placed upon the market at 95 cents on the dollar, and that such of the bonds as were actually sold, if any, were sold at that price.

It is also alleged, in substance, that the vote in favor of the bonds was induced mainly by representations made to the voters that none of the bonds should be sold below par.

It is now insisted, that by reason of these facts it was illegal to repeal

the provision and to sell the bonds at less than their face value. The proposition submitted at the election contained no condition limiting the price at which the bonds should be disposed of; and the citizens who voted at the election must be held to have known that the ordinance which had been passed limiting the price was subject to repeal by the council which passed it, or by any future council.

Conceding, for the sake of the argument, that we could inquire into an election held strictly according to the terms of law, we are of opinion that we could not set it aside by reason of any fraudulent representations that may have been made to the electors in order to procure their votes. Having a plain proposition submitted to them, the voters must be presumed to know its meaning and effect, and to act at their peril; and in the absence of bribery or other like corrupt influence, in a proceeding affecting the validity of the election, no inquiry as to their motives can be permitted. The proposition submitted at the election did not limit the rate of interest the bonds were to bear. The question of discount in such a case, in its final analysis, is a mere matter of interest, and ought in no respect to affect the validity of the bonds, provided the discount and the interest expressed do not make the rate usurious. In this case, the bonds bore interest at the low rate of only 5 per cent per annum, and the discount was only 5 per cent of their face value. Therefore the bonds were not invalid on that account.

We come now to what we conceive to be the gravamen of the complaint in this case. It is contained in the eleventh and twelfth paragraphs of the petition. They are as follows:

" 11. And your petitioner further shows, that the aforesaid bonds, while apparently for a lawful purpose upon the face thereof, and upon the face of the proceedings of record which relate to them, were and are in truth and in fact, as petitioner is informed and believes, and therefore charges, unlawful, among other things in this: that the said bonds provided for, issued, and proposed to be issued were so provided for, issued, and proposed to be issued under the mere semblance and fraudulent pretense of lawful power for the ostensible purpose as therein set forth, but in reality in pursuance of a fraudulent scheme, participated in by all the defendants, in reckless defiance of law and their duties in that behalf, of embarking said city in the visionary and chimerical enterprise or venture, wholly outside of and beyond any power or authority conferred upon it by the aforesaid acts which constitute its charter, of damming the Colorado River, to obtain water power to sell or lease for speculative or commercial purposes, and in connection therewith for the construction and operation of a steam railroad, another act for the doing of which the said city is utterly without power or authority under its aforesaid charter; that the main and real purpose of the issue and proposed issue of said

bonds, and of the passage of the aforesaid ordinances, was to obtain water power to operate manufactories and machineries, the power to be leased or sold as commerce for gain; that the providing of water works for said city, as contemplated by the charter thereof, and of lighting the said city, was a mere incidental result of the said unlawful scheme; and if it was lawful to exercise the latter power, by the means and in the manner attempted, yet in the exercise thereof the lawful and the unlawful are so intermixed and interwoven that the one is inseparable from the other, and the whole vitiated and rendered invalid.

"12. And your petitioner further represents, that in the latter part of the year 1889 certain persons conceived the idea of making the said city of Austin a great and populous commercial and manufacturing center, by means of the construction of a dam across the Colorado River, above the city, of such proportions as would result in the production of vast water power as a motive power to be applied to manufacturing enterprises; that private capitalists refused to invest in the enterprise or embark their means in so reckless a venture; that the scheme was then concocted by the said defendants for the city of Austin, in her municipal corporate capacity, to undertake the enterprise; that one J. P. Frizell, a scientific hydraulic civil engineer, made the surveys and soundings, and reported to said mayor and city council that the cost of the undertaking would approximate $1,358,550, and that a motive power would be secured by the dam equivalent to 14,000 horse-power, of which 2000 horse-power would be sufficient to operate a system of water works and electric lights, and suggesting that the said city would have a surplus or excess of 12,-000 horse-power to be operated, rented, and leased by the said city for manufacturing purposes for profit, of the estimated commercial annual value of $200,000 to the city; that all proceedings subsequently had, as herein shown, were to carry out the scheme suggested by said report, which was taken by said council as a basis of subsequent action by the said city council, which report is made a part hereof; that the said city, not having authority to engage in the private business of damming the Colorado River, to secure vast water power to be operated, rented, or leased for profit, for manufacturing purposes, and to induce population and capital to come to the said city, the said mayor and city council, aided and assisted by the other defendants, under color of the authority vested in said city by its charter, attempted by the several proceedings hereinbefore shown to have the said city undertake the said unlawful enterprise, under the false and fraudulent pretense of merely constructing and operating water and light systems, as authorized by the aforesaid charter."

The engineer's report, which is made a part of the petition, is omitted on account of its length. We presume that the purpose of inserting the engineer's report was not to plead the evidence, but because it was to

show definitely and precisely in what the alleged fraud consists.    The eleventh and twelfth paragraphs of the petition were excepted to specially for indefiniteness; and we are of opinion, that unless the report is to be considered as a part of the petition, and as setting out in detail the character of the work that was to be performed, the exception was well taken.

It is not good pleading to allege that an act has been fraudulently done, or is about to be fraudulently done, but the particular means by which the fraud is to be accomplished must be alleged.    This rule applies with peculiar force when the court is asked to interfere with the exercise of the legislative discretion devolved upon a municipal council, and to enjoin their action upon the ground that they are about to do an act in excess of their authority.   So in this case, it is not sufficient, as against a special exception, to aver in a general way that the city, under the pretense of establishing water works, proposes to dam a river to create water power, and thereby to encourage the establishment of manufacturing enterprises.    The petition should allege specifically what is proposed to be done, so that the court may draw the legal conclusion from the facts stated; or it should appear that the specific facts were not within the knowledge of the plaintiff.

The averments in the twelfth paragraph, that all the proceedings subsequent to the report of the engineer " were to carry out the scheme suggested by said report, which was taken by said council as a basis of subsequent action by said city, which report is made a part hereof," is sufficient to show, we think, that the object of the pleader was to allege, that the work recommended by the engineer was the work which the council was about to perform.

Proceeding, then, upon this assumption, and disregarding vague and indefinite allegations, the question arises, whether the undertaking of the city council to carry out the recommendations of the engineer, as shown in his report, shows such a clear abuse of the powers conferred upon the council as will justify the court in restraining their action.

We shall not undertake to give even a synopsis of the very elaborate report made by the engineer to the city council.    It shows, we think, that the engineer understood that it was at least the main purpose of the city to construct a dam to supply itself with water and with electric lights.    The estimates, with one exception, to be hereafter noted, are made upon that basis.    The total estimated cost of the entire work is $1,358,550.    The estimated cost of the dam alone is $461,325.    The remainder, $897,225, is allowed as the probable expense of the necessary machinery and constructions to put in operation the system for supplying the city with water and lights.    These latter works the city is authorized by its charter to construct.    It also has the power to construct a dam of sufficient capacity to supply the power necessary to operate the system.    It is, however, to be inferred from the report, that a lower and less ex-

pensive dam than that which the city proposed to build would be capable of furnishing the necessary power for the purpose indicated, at least so far as the present wants of the city are concerned. What the difference between the cost of the proposed dam and one which, in the opinion of the engineer, would have been sufficient, under existing circumstances, to operate the works for supplying water and lights, does not appear.

If, however, the facts alleged in the petition had shown definitely what the probable difference is, could the court restrain the action of the council, without interfering with a lawful discretion confided to them by the Legislature?

When a municipal body undertakes the construction of a public building, they must consider the present and prospective wants of the municipality, and determine its dimensions and capacity. Has a court the right to interpose, to determine these questions for them, and restrain their action, when in its judgment the capacity is greater than the necessities of the immediate situation may demand? Could the building of a court house be enjoined merely because the proposed structure was intended to contain more rooms than would be required to accommodate the courts and to provide the necessary offices for the county? Can the purchase of a farm for the maintenance of the paupers of a county be restrained merely by showing that it embraced more acres than could be cultivated by the labor at the county's disposal, although it should be made to appear that it was contemplated that the excess might be leased for the purpose of bringing in a revenue to the county? These questions must, as a general rule, be answered in the negative. There may be exceptional cases, but only when there is an undoubted excess of authority and the abuse of the discretion is palpable.

We are of opinion, that the petition before us does not make such a case. In the first place, the engineer's estimate is based largely upon data of an uncertain character. The extent of the containing reservoir to be created by the dam, and the probable flow of the river, are principal elements in the calculation, and are in their nature practically undeterminate. The latter especially depends upon the rainfall in a region noted for the irregularity of its seasons. Under such circumstances, would prudent management dictate that the engineer's estimate should be closely followed, and a dam constructed which, in his opinion, is barely sufficient to meet the existing wants of the city; or would it demand that the construction should be of sufficient height to furnish the necessary power under all circumstances, and to meet any probable contingency? Would it be wise economy to risk a failure of a water supply, and the consequent damage to the property of the city and to the health of the inhabitants, or to so construct the work, at an increased expense, as to provide against future conditions dependent upon facts of an underminate character?

Again, a dam of the character indicated in the report is not a work for a few years, but it is one which may be expected to stand as long as the city itself. The city, the capital of the State, will hardly remain stationary, at a time when all other cities in the country are growing with great rapidity. Was it, under the circumstances, an exercise of a provident discretion, to disregard the future and provide only for existing necessities? or was it an act of prudence to look to the future, and to make provision for prospective wants?

These are not questions for the courts to answer. They were all to be considered and determined by the city council in passing upon the proposition to construct the dam. If they have determined that a dam of the dimensions specified in the engineer's report is requisite in order to secure the power necessary to provide water in any probable contingency resulting from drouth, or to meet in future the wants of an increased population, can it be said that they have clearly exceeded their authority, even though they may have contemplated that, for a time at least, there may be an excess of water power, which may be available for other purposes, and may bring a revenue to the city?

If the general charge, which is preferred in the eleventh and twelfth paragraphs of the petition, that the supply of water and lights was a mere guise and pretense for constructing the dam, and that its main purpose was to promote manufacturing enterprises, and the providing of water and lights a mere incident, had been borne out by the detail of the work as developed in the engineer's report, we would have a very different case. But the works which are there recommended, and which the petition alleges are about to be constructed, show that the principal object was to supply the city with water and lights; the use of any excess of power which might be developed was merely a probable and contingent result. Under such circumstances, it would seem that the proposed constructions must speak for themselves, and that any inquiry from other sources as to the hidden motives of the city council is not to be permitted. We think the demurrers to the paragraphs of the petition under consideration were properly sustained.

It is further alleged, that at the time of the passage of the ordinances for the election and the issue of bonds, the city had a contract with a certain company, by which it was provided with an adequate supply of light and water, and that that company was still able and willing to carry out its contract, and to supply all the light and water which the necessities of the city required; and it is insisted, that by such contract the city had exhausted its power to procure water and light from any other source. It seems to us, the statement of the proposition carries with it its own refutation. In this State, no city can grant an exclusive right to furnish either water or lights. Brenham v. Water Co., 67 Texas, 544. The ar-

gument comes down to this, that whenever a city has made a contract with a company able and willing to supply it with the necessary water and lights—terminable it may be at the city's option, and burdensome in its terms—its power is exhausted, and any attempt to procure water and light by other means is ultra vires and void. Such an argument can not be maintained.

There are other grounds set forth in the petition for holding the bonds invalid; but they are not insisted upon in the brief of counsel for appellant. We regard the questions presented as being raised by the assignment of error, and have therefore considered them, and are of opinion that as to these grounds also the demurrers were properly sustained. Not having been urged in the brief, we deem it unnecessary to discuss them.

For the reasons given, we are of opinion that the judgment of the Court of Civil Appeals should be reversed and that of the District Court of Travis County should be affirmed; and it is so ordered.

*Judgment below affirmed.*

Delivered May 25, 1893.

### ON REHEARING.

GAINES, ASSOCIATE JUSTICE.—All the points presented by the motion for a rehearing in this case, save one, were very carefully considered and were disposed of in the former opinion. We do not see that the questions there determined demand any further discussion.

It is now, however, urged, for the first time, that the judge who heard and determined the cause in the trial court was disqualified to sit in the case, and that, therefore, neither that court, the Court of Civil Appeals, nor this court acquired jurisdiction of the cause. The question was not raised in the trial court, but is presented for the first time in this court, and the fact of disqualification is attempted to be shown by an affidavit.

This court has "power, upon affidavit or otherwise, as by the court may be determined, to ascertain such matters of fact as may be necessary to the proper exercise of its jurisdiction." Const., art. 5, sec. 3. But we do not understand that this provision of the Constitution applies to questions which were put in issue or which could have been put in issue in the trial court, but only to such as may arise after a final disposition of the case in the court from which the appeal is taken. It has been practically so decided. Chrisman v. Graham, 51 Texas, 454, and cases cited. Every court must in the first instance determine its own jurisdiction; and when a question affecting its jurisdiction has arisen in a Court of Appeals after the final decision of the matters in controversy in the court a quo, the appellate court must of necessity hear evidence dehors the record in order to determine it.

The question whether or not the trial court had jurisdiction must be determined by the record.

The motion is overruled.

*Motion overruled.*

Delivered June 19, 1893.