HORTON et al. v. SMITH et al.†

(Court of Civil Appeals of Texas. Dallas. March 16, 1912. Rehearing Denied April 6, 1912.)

1. FRAUD (§ 1*)—NATURE OF "FRAUD."

"Fraud," generally speaking, is any act or concealment which involves a breach of legal duty, trust, or confidence justly reposed and is injurious to another, or by which an undue and unconscientious advantage is taken of another.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 1–7; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 3, pp. 2943–2954; vol. 8, p. 7666.]

2. RELIGIOUS SOCIETIES (§ 34*)—ECCLESIASTICAL TRIBUNALS — FRAUDULENT CONDUCT.

The action of the General Assembly of the Cumberland Presbyterian Church in voting on the question of union with the Presbyterian Church of the United States at its evening session of a day after the adoption of a resolution fixing the following day as the time to vote thereon is not such legal fraud as will vitiate the vote for union, though a sufficient number of members of the assembly were misled and absented themselves from the evening session to have defeated union.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 209–211; Dec. Dig. § 34.*]

3. RELIGIOUS SOCIETIES (§ 34*)—ECCLESIASTICAL TRIBUNALS—FRAUDULENT CONDUCT.

Where a resolution for union with the Presbyterian Church of the United States had been pending for several days before the General Assembly of the Cumberland Presbyterian Church, and a campaign of the question of union had been waged for a year, the fact that some of the members of the assembly were misled into voting for the union in consequence of an opinion of the moderator, given in response to a request therefor, did not vitiate the vote for union, since such members voted at their peril, and they could not be heard to say that the result of their votes was fraudulent.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 209–211; Dec. Dig. § 34.*]

Error from District Court, Dallas County; Kenneth Force, Judge.

Action by H. A. R. Horton and others against J. Frank Smith and others. From a judgment for defendants, plaintiffs bring error. Affirmed.

J. J. Eckford, of Dallas, and R. S. Neblett and W. W. Ballew, both of Corsicana, for plaintiffs in error. M. B. Templeton, of Dallas, for defendants in error.

RASBURY, J. This suit was instituted in the district court of Dallas county by H. A. R. Horton, N. E. Gill, C. W. McKinney, S. R. Shepherd, and S. A. Maben, claiming on their part to compose the session of the First Cumberland Presbyterian Church of Dallas, Tex., and by W. H. Gaston, S. R. Shepherd, and V. H. Wilson, trustees, who sue in their representative capacities for themselves and all other members of the congregation of said church, against J. Frank Smith, W. T. Fakes, J. T. Prague, J. W. Lindsley, F. J. Dickey, S. Lauderdale, J. C. Bigger, and E. Smith, alleged to constitute the session of the Central Presbyterian Church of Dallas, Tex., and also against J. M. Strong and R. B. Seay, trustees for said last-named church. The purpose of the suit was to recover from the defendants lots 17 and 18 in block 108 of James Bentley's subdivision of certain lands in the city of Dallas, Tex., deeded prior to the institution of the suit to the trustees for the Cumberland Presbyterian Church of Dallas, Tex., and upon which lot of land the church edifice stands. The deed to the land recites a valuable consideration and conveys the land by general warranty deed to the trustees of the Cumberland Presbyterian Church of Dallas. "The Cumberland Presbyterian Church had its origin as an organization about the year 1810. The Presbyterian Church of the United States of America had churches in Kentucky and Tennessee, with presbyteries organized therefor. In about the year 1801 some of the preachers disagreed with the mother church on the doctrine of foreordination and predestination, etc., and began to preach a different doctrine. It is unnecessary to detail what transpired during the time that this controversy was going on. The result was that in the year 1810 a number of the preachers that were so engaged organized the Cumberland Presbyterian Church. The church made rapid progress and development, and, in the course of a few years, overtures were made between it and the mother church for a reunion; but they were not able to agree until in the year 1903, when a plan was adopted which was accomplished in 1906, and the two churches were reunited." Brown v. Clark, 102 Tex. 323, 116 S. W. 361, 24 L. R. A. (N. S.) 670. As said by Judge Brown in the case just cited, much dissatisfaction in the Cumberland Presbyterian Churches resulted from the union or reunion with the Presbyterian Church in the United States of America, and in the Dallas church there was a difference of opinion upon the subject among its members, and plaintiffs in this suit, claiming they represented the Cumberland Presbyterian Church at Dallas, brought this suit to recover possession of the land and church building, alleging that the defendants had wrongfully taken possession of same. The defendants in the action claim to be the session of the Presbyterian Church in the United States of America, and are in possession of the property, and claim that by the reunion the property was transferred to the Presbyterian Church in the United States of America. The case was tried before a jury, but at the conclusion of the trial the lower court directed the jury to return a verdict for the defendants, and hence it becomes necessary for us to determine whether the testimony under the pleadings warranted the submission of the case to the jury.

Plaintiffs' pleading in the court below and their briefs on file in this court, with the exception hereinafter referred to, raise the question of the authority of the General Assembly of the Cumberland Presbyterian Church to consummate the reunion and union of that church with the Presbyterian Church in the United States of America, claiming the same to be unlawful and unauthorized either by the law or creed of the Cumberland Presbyterian Church, which being true, it follows that the reunited church has no right to worship in the church building or control or manage same. Since the decision of the Supreme Court in the Brown-Clark Case, supra, we content ourselves by a reference to that decision in disposing of the contentions of the plaintiffs in error, which in any respect raise the question of the lawful authority of the Cumberland Presbyterian Church to merge with the Presbyterian Church in the United States of America.

However, plaintiffs in error go further by their pleading and aver that, if there was any authority vested in the General Assembly and the presbyteries of the Cumberland Presbyterian Church to take the several successive steps by which said merger was effected, and if such proceedings were in conformity with the constitution of the Cumberland Presbyterian Church, still such proceedings were ineffectual because same was accomplished through fraud and deceit, and specially plead the following facts as constituting such fraud and deceit, to wit: (a) That while the report on union and reunion was pending before the General Assembly at Dallas, Tex., in 1904, when and where it was adopted, a motion was also adopted fixing the time to vote thereon as the morning of May 26, 1904, and that, relying on said action of the General Assembly, many of the commissioners to the assembly who were entitled to vote on the question absented themselves from the night session of May 25th, at which session, late at night, the report was taken up and adopted by the assembly. (b) That at said session and prior to the vote upon and the adoption

of the report the moderator of the session, whose duty it was, when requested, to properly state the matter to be voted upon and to explain its effect in reply to the inquiry from a commissioner whether or not union or reunion was recommended to the presbyteries by said report, replied in substance that the question about to be voted upon was to submit union or reunion to the presbyteries without recommendation, while the report in truth and in fact recommended union or reunion to the presbyteries and by which action of the moderator eight of the commissioners to the assembly were misled and deceived, and that they would have voted against said report had they been properly informed of the real question submitted, and thereby defeated same, and that the statement of the moderator was not true and was fraudulently made to deceive those opposed to reunion. (c) After the adoption of said report recommending reunion of the two churches, the report was submitted to the presbyteries of the Cumberland Presbyterian Church for their approval or disapproval, and plaintiffs charged that many of the Cumberland Presbyterian ministers who favored reunion of the churches fraudulently and illegally practiced a system of double voting by which reunion was adopted in a number of presbyteries; the specific charge being that those so charged would vote for reunion in their own presbytery and then go to other presbyteries and again vote for reunion, and instanced a number of cases where certain ministers had voted on reunion in different presbyteries and in one specific case charged that by such method of voting a given presbytery voted for reunion by a single vote, and that such double voting was done at the behest of the managers for the union cause and was fraudulently done to defeat the true will and voice of said presbyteries. (d) That in submitting the question to the presbyteries certain further fraudulent political methods were resorted to by those favoring reunion for the purpose of overriding and defeating the true will of said presbyteries; said methods being unfair and fraudulent and prevented free expression by the presbyteries on the issue and instanced the case of a secret circular issued by the secretary of a steering committee on union information, directing the vote on reunion to be taken at next meeting if it could be carried, but if it could not carry to postpone it, offering to furnish the literature or visiting debaters to render any legitimate assistance where the issue is uncertain. (e) That it was the general policy of the union leaders, after the union was consummated, to brand the loyal Cumberland Presbyterians as agitators, and offered to pay the expense bills of those engaged on the union side, and instanced that fact by an excerpt from a circular sent out by J. M. Patterson, secretary of one of the boards of the church wherein the friends of the union

cause are urged, to find out quickly where the anti-union agitators are at work and camp on their trail; to leave none of their misrepresentations unanswered for 24 hours; to expose their methods in the city and town papers; to drive them from the presbytery as quickly as possible; that the committee was willing to pay all expenses incurred in traveling and corresponding.

On the trial of the case, and under the foregoing special pleading, the plaintiff offered the following pertinent evidence: A. W. Baldridge, 72 years of age, Cumberland Presbyterian minister, Trenton, Tenn., testified that he was in attendance upon the General Assembly of the Cumberland Presbyterian Church at Dallas in 1904, as commissioner to the assembly, representing a California presbytery; that a motion was made and adopted by said assembly on May 25, 1904, fixing the morning of May 26, 1904, upon which to vote upon the report of the committee on reunion; that himself and others so understanding were not present at the night session of the 25th; that he would have voted against the resolution had he been present, as would have several other commissioners who remained away from the night session because they also understood the question would be voted upon on the morning of the 26th; that Judge Fussell of Columbia, Tenn., made the motion, and that Judge Settle, of Kentucky, was presiding, and the motion to vote on 26th carried without a dissenting voice; that he retired early on the night of the 25th, with the view of being present on the morning of the 26th; that he was opposed to submitting the matter to the presbyteries; that no one represented to him that the vote would not be taken on the night of the 25th; that he knows of no one who was induced to remain away by representations that the vote would not be taken the night of the 25th; but that the adoption of the motion to vote on the 26th did influence him and others to remain away, in fact, as many as two or three told him they were away from the night session because it had been postponed to the next day, and if they had been present they would have voted against the report; that he did not protest against the vote as taken because others had done so.

J. J. McClellan, of West Point, Miss., attorney, 52 years of age, testified: That he was present as visitor at Cumberland Presbyterian Assembly at Dallas, in 1904, and heard most of the discussion relating to the adoption of the committee report on reunion of the churches. That, at the afternoon session of the assembly of the day the final vote was taken on the report, Judge Fussell stated to the assembly that many of the members were not well, some were feeble, and that it would be a burden for them to attend all sittings of the assembly, and in order that it might be understood when the final vote on the report was to be taken, he moved that the time be fixed for 10 or 11 o'clock of the

following day. That the motion was duly seconded and carried just before adjourning the afternoon session. That on reconvening for the evening session motion was made to hear one speaker from each side and to then take the final vote. That Judge Fussell objected to the motion on the ground that the time for final vote had been fixed for next day, and, having so understood, many of the commissioners were absent, but the motion for final vote was adopted nevertheless. After debate and demand for the question, and just before voting, a member arose and, addressing the moderator, stated he was instructed to vote against reunion while personally for reunion, and inquired how he should vote, to whom the moderator replied stating it was a matter for the member to determine for himself, though he did not think the presbyteries had a right to restrict him in his vote or words to that effect, and that this commissioner voted for reunion. That after the foregoing, the name of Rev. Duncan Wallace was called, who stated that he was personally opposed to reunion, but knew his presbytery favored it, and hence he would vote for it. That while the voting was in progress a member who he has since learned was named Russell, stated, in effect, to the moderator that he and seven others were uncertain concerning the effect of the resolution being voted on; it being claimed by some that it recommended reunion, and by others that it only referred the matter to the presbyteries. That Russell and his friends were opposed to reunion, but, if the effect of the resolution was merely to refer the matter to the presbyteries, they would vote yes, but, if it meant a vote for reunion, they would vote no. That some one who he thinks was Dr. J. M. Hubbard said something undertone to the moderator before he ruled, whereupon the moderator ruled that the effect of the resolution was simply to refer the question of reunion to the presbyteries and was not a recommendation therefor. That the member who asked the question voted yes, but he does not know how the others voted, nor who they were. That it is his understanding that the ruling of the moderator on any question carries with it the ruling of the house and was more than the mere opinion of a private member. That he does not consider himself bound by the interpretation given by the moderator, though if he be a fair presiding officer he would give great weight to his opinion, and many might have accepted that interpretation of the report when made by the moderator.

Judge Joe H. Fussell, of Columbia, Tenn., 75 years of age, lawyer, testified that he was in attendance upon the General Assembly of Cumberland Presbyterian Church in Dallas in 1904, and had been selected as their leader by those who opposed reunion: "On Wednesday, as I now remember, at the adjourning hour, at the Christian Church, where the assembly was holding its meeting on that day, I made a motion that the vote on the question under discussion be taken to-morrow at noon. This motion was carried without objection. A night session was held at the Cumberland Presbyterian Church. This was Wednesday night, May 25th. Soon after I had taken my seat in the assembly room that night, a commissioner on my right and just across the aisle from me arose and made the motion to take the vote immediately after the debate that night. I immediately, on behalf of those who were opposed to the adoption of the Templeton resolution, opposed the motion to take the vote that night, giving as my reasons that the assembly had unanimously agreed that day to take the vote on the adoption of the resolution under consideration to-morrow at noon; that there were members who were absent that night who believed that the vote would not be taken until the next day at noon. I stated that I had informed many who would oppose the resolution that the vote would not be called for until the next day at noon. The motion prevailed, and at a late hour that night the vote was taken and carried by a bare majority, four votes, and, by the change of one vote, five. Before the vote was taken, one commissioner, the Rev. J. A. Russell, got the privilege of the floor and asked the ruling of the moderator on the following question: 'What are we going to vote on?' 'Are we voting to send this matter down to the presbyteries on the recommendation of the General Assembly, or merely for the approval or disapproval of the presbyteries?' Said Russell stating further: 'There are eight of us who are opposed to the union; but we are willing to submit the question to the presbyteries, without recommendation of the assembly.' Whereupon the moderator hesitated a moment, and turned his head slightly to the left. The stated clerk, who was sitting immediately behind the moderator, made some remark in a tone so low that I could not hear what he said. The moderator then replied: 'This is merely to submit the resolution to the presbyteries for their approval, without recommendation.' Just then the Rev. T. M. Hurst, a commissioner, arose and stated that the four commissioners from his presbytery were instructed to vote against the union, but they were in favor of submitting the question to the presbyteries for their approval or disapproval. The moderator then remarked that if it was his case, and he was opposed to the union, that he would vote to submit the question to the presbytery and then he would vote against it in his presbytery. When the debate closed, the vote was taken, near the hour of midnight, with the result above given. I was present when the vote was taken upon the question of organic union at Dallas, Tex. I was a member of the General Assembly. Judge W. E. Settle was the moderator and was in the chair at the time that

the vote was taken on the question of organic union. I made the closing argument for the negative, and Dr. Templeton made the closing argument for the affirmative. After several days' discussion by both sides, the vote was taken on the 25th of May, 1904, at night. I did not move a reconsideration. When the vote was closed, there was great confusion. Yelling, hissing, waving of hats, and singing, so that no one could get the attention of the chair. This prevailed to such an extent that, when Mr. Russell made an effort to have his vote changed, he failed to secure recognition from the moderator. The report of the committee had been read, and the Templeton resolution had been under discussion for two or three days. The motion to take the vote at the close of the argument on the night of the 25th at Dallas Assembly was most seriously contested in open assembly. The question of fraud was openly and earnestly presented and argued before the Assembly at Fresno, in 1905. I do not consider that a commissioner is absolutely bound by the interpretation of a question given by the moderator. But such interpretation given by him as the moderator would be generally regarded as a ruling, and the average commissioner would feel justified in following or taking such interpretation as his guide in acting upon the question involved. Each member was supposed to cast his vote as seemed to him to be just and right. How he arrived at his opinion as to the proper course to pursue, or what influenced him to vote for or against the resolution. I am not prepared to answer in every instance. The object of the discussion on both sides was to influence votes, for or against the adoption of the resolution. I have heretofore stated that I did not know the persons represented by Mr. Russell. 'There are eight of us,' etc. Neither do I know the address of the eight or any of them. I knew one commissioner who was absent, sick. I left him at the hotel, unable to go out. When his name was called, he voted for the union; he was a unionist. And when I went home that night I said to him, 'I thought you were sick,' and he said: 'I was, but they sent for me and told me to get up out of bed and come on. If I didn't they would be defeated.' This was my old confederate friend, Tom Hardison. I insisted in open session that it would be wrong and unfair to take the vote that night under the circumstances. I had notified some who were opposed to union that the vote would not be taken until next day at noon."

John Stevens, a witness for plaintiffs, a minister of the gospel of the Cumberland Presbyterian Church and a commissioner to the General Assembly at Dallas, in 1904, testified: That he was present during the entire session of the General Assembly. That on the afternoon of May 25th, before adjournment in the Christian Church, Judge

Joe H. Fussell made the following motion: "That the vote on the question of submission or adoption of the report"—that is, "the final vote on union—be taken to-morrow at noon." "This motion was carried, without dissenting voice. At the night session there was a motion made that the vote be taken immediately after the closing argument that night. That the Honorable Joe H. Fussell, who had made the motion to take the vote to-morrow at noon, arose and objected, stating that several commissioners were absent, expecting the final vote to be taken at noon the next day. The Reverend J. A. Russell asked the following question, when the vote was to be taken: 'Brother Moderator, what are we voting on, union, or what?' The moderator answered: 'No, we are not voting on union, but to hand it down the presbyteries without recommendation.' The Reverend Russell stated that 'there are eight of us who are opposed to union, but are willing to submit the question to the presbyteries for their approval or disapproval.'" The witness Stevens stated that he remonstrated with the Reverend Russell that he would find out, when too late, to his sorrow. "Brother Russell asked to have his vote recorded against the union, and the moderator refused to recognize it. I said to Rev. Russell, 'I knew you would be deceived.' He had stated to me before the vote was taken that he was willing to trust his brothers." Witness testified that the Honorable J. H. Fussell, the acting chairman of the anti-union forces, vigorously protested when the vote was taken that night at the close of the argument. Witness further testified that the Reverend T. M. Hurst announced that there were four from his presbytery who were instructed to vote against union, but were willing to submit the question to the presbyteries for their approval or disapproval. The moderator stated in reply that, "if it were his case, he would vote to submit the question to the presbyteries, and would vote against it in the presbytery, if he were opposed to union."

Rev. J. A. Russell testified: That he was an ordained minister of the gospel of the Cumberland Presbyterian Church, and a commissioner to the General Assembly at Dallas, in 1904. That there was a motion made, during the evening of May 25th, that the final vote would be taken next day at noon. That there was strong opposition to taking the vote that night. When the motion was made that the vote be taken at night, the reason of the opposition was that a number opposed to the so-called union were not present, as they understood the vote would not be taken until the next day. Witness testified that he heard a number of commissioners who opposed union state that they were not present when the vote was taken, because they understood it would not be taken until the next day. He further testified that on the floor of the open assembly, before the vote was taken, he asked Judge Set-

tle, the moderator, "if in voting yes, we recommend the proposed basis of union." The moderator said, in answer, "We are voting to submit, and this vote does not recommend the proposed basis of union." On his statement there were eight of us who voted for submitting the question, who would have voted against it, if he had said it recommended the proposed basis of union. That he does not swear that Judge Settle did decide that we did not recommend the proposed basis of union. He further testified that the Reverend J. F. Latimer and the Reverend J. E. F. Robertson came and joined our presbytery at the time that the vote was taken by the presbyteries, and each of them voted for union, and each of them told me that they had voted for union in their respective presbyteries before coming to this presbytery.

Close examination of the testimony of these witnesses shows that the pertinent facts which their evidence tended to establish under the charge of fraud was the action of the assembly in voting on the resolution submitting reunion to the presbyteries at the evening session on May 25th, when by former action it had agreed to vote on that resolution at the morning session of May 26th, and that as a result a number of commissioners were misled and absent who, but for the unexpected action of the assembly, would have been present and voted against the resolution and probably defeated it; that the moderator, in answer to inquiries from a commissioner, who made the inquiry for himself and a number of others, informed said commissioner, at a stage in the proceedings when the error could not be corrected, that the resolution about to be voted upon merely meant to refer the question of reunion to the presbyteries without recommendation, while the report in truth recommended reunion, which statement misled as many as eight commissioners to vote for the resolution who would otherwise have voted against it; although the question of whether the report recommended reunion or not seems to have been generally debated and a matter finally of individual opinion and construction; that two ministers voted in two different presbyteries on reunion, though it is not shown by the testimony that the votes were illegal or improperly cast, and we shall assume they had a right to vote as they did. Fairly stated, the above comprehends the facts proven under the allegations of fraud. It is also fair to state that the pleading and proof of defendants in error met squarely the issues and sharply contested every material fact established by plaintiffs in error. These charges of fraud and deceit were carried to the General Assembly in 1905, and in 1906, and were on both occasions vigorously presented, urged, and debated, but were not sustained in any part by the assemblies. The dissatisfied minority at the 1906 assembly refused to be bound by the actions of the several assemblies and organized and continued what they denominated the General Assembly of the Cumberland Presbyterian Church. It is also important to note that the General Assemblies in 1905 and 1906 again adopted resolutions of merger or reunion as proposed at the 1904 assembly and by the 1904 assembly submitted to the presbyteries, a majority of which adopted the resolution and reported to the 1905 assembly their approval of the same.

[1] "It has been said that fraud cannot be exactly defined so as to fit every case; but generally speaking fraud is any act or concealment which involves a breach of legal duty, trust or confidence justly reposed and is injurious to another or by which an undue and unconscientious advantage is taken of another." Kellum v. Smith, 18 Tex. 836.

[2] The majority of the General Assembly of 1904 in the exercise of its authority voted to consider the resolution on reunion May 26th. By the same right and at its next session it voted to consider the resolution there and then. We do not understand that it is claimed that the assembly did not have the right when once regularly assembled to do all things within the purview of its organization. Nor do we understand that the right of the assembly to fix the 26th as the time to vote on the report on reunion is disputed, but that, having fixed the 26th, as the day upon which to vote, it induced many to remain away from the assembly on the evening of the 25th, when the final vote was taken, who presumably were not as deeply interested in routine matters as they were in reunion. This may be true, and yet can it be said that it constitutes fraud in a legal sense? Those opposed to reunion proposed to the assembly that it set a particular day to consider the question, thereby admitting the authority of the assembly to take the question up when and as it pleased. If the assembly had the right to vote on the question on the 26th, it certainly had the right to vote on it on the 25th. It is not claimed that reunion between the churches is void because the resolution was passed on the 25th, but because the reunionists deceived those opposed thereto in believing the vote would be on the 26th. Concede that, at the time the vote was taken on the resolution, the reunionists recognized, so far as their case was concerned, that the psychological moment was upon them, was it not their right to then and there ask the assembly to put the question to the test, regardless of a former declaration of the assembly that it would vote the next day? We believe the assembly had the right, so far as the record before us goes, to vote on the question at its pleasure according to the will of those constituting its membership. Nor do we believe plaintiffs in error can complain, even though it should be clearly shown that

a sufficient number of members were misled and remained away to have defeated the resolution. Deliberative bodies are generally controlled by majorities, and those duly accredited to membership therein are charged with notice of the fact that all things properly cognizable by the body convention or assembly may be disposed of at any time while it is in session, which includes as a matter of course the right to rescind any former action, unless some adopted law or rule of proceeding to the contrary can be shown. Those who were absent from the assembly when the vote was taken, it seems to us, had no greater right or more important duty than to be present at all times during the sessions of the assembly and maintain, if they could by their vote and influence, their attitude and conviction on the great question then pending before the assembly. If their vigilance relaxed or their cause lacked votes in the assembly, it is rather a case of defeat than fraud. In our opinion, there was no legal fraud in the action of the assembly in taking up and voting upon the resolution on the 25th of May. The charge of deceit and misrepresentation brought against the moderator of the assembly is clearly untenable. What he may have said relating to the meaning of the resolution was finally but his own opinion and conclusion and should not have misled any one materially.

[3] Besides, the probative force of the testimony of the witnesses that they were deceived by the expressions of the moderator is unsatisfactory. The resolution had been pending a number of days. Nearly all the witnesses had participated in the campaign that had been waged for a year, and it was reasonable to suppose that they surely had reached some conclusion about the matter the moment preceding the casting of their votes, and, even though they were misled, we conclude that, in substituting the judgment or opinion of another for their own in determining how they should vote, they did so at their peril, and they cannot now be heard to say that the result of their votes was fraudulent and illegal. See, also, on this question, City of Austin v. Nalle, 85 Tex. 520, 22 S. W. 674, 960.

While the charge of fraud in procuring votes in the 1904 General Assembly and in the presbyteries to which the resolution was referred was not affirmatively raised in the Brown-Clark Case, defendants in error insist that, in view of the authority conceded to the General Assembly by that decision, plaintiffs in error cannot review before the civil courts the method of proceeding in the assembly, but must submit the matter to the assembly itself. This may be correct; but, in view of the conclusion we have reached, it will not be necessary for us to determine that point.

Finding no error in the record, the judgment of the trial court is affirmed.