**Affirmed and Opinion filed July 10, 2012.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

———————————

## NO. 14-11-00688-CV

———————————

### ALLEN MARK DACUS, ELIZABETH C. PEREZ, AND REV. ROBERT JEFFERSON, Appellants

### V.

### ANNISE D. PARKER AND CITY OF HOUSTON, Appellees

---

**On Appeal from the 234th District Court
Harris County, Texas
Trial Court Cause No. 2010-81591**

---

## OPINION

In this election contest, three Houston voters contend that the language used in election ballots to describe a proposed amendment to the City's charter was misleading. They additionally assert that both the proposed amendment and the ballot language used to describe it impermissibly addressed more than one subject. The trial court granted summary judgment to the contestees, Mayor Annise D. Parker and the City of Houston, and denied the contestants' motion for new trial. We affirm.

# I. Terminology

One of the primary issues in this case is the question of whether, in submitting a proposed city-charter amendment to voters, the City used misleading language in the ballot. Because a comparison of the language used in the proposed charter amendment and the language used in the ballot is central to our review, it is important to distinguish between the two. In accordance with the Election Code, we refer to the proposed charter amendment as "the measure" and to the language used in the ballot as "the proposition." *Compare* TEX. ELEC. CODE ANN. § 1.005(12) (West 2010) ("'Measure' means a question or proposal submitted in an election for an expression of the voters' will.") *with id.* § 1.005(15) ("'Proposition' means the wording appearing on a ballot to identify a measure.").

# II. Factual and Procedural Background

Houston is a home-rule municipality, and in 2010, a petition containing a proposed amendment to the City's charter was circulated and signed by a sufficient number of qualified voters to be included on the ballot. *See* TEX. LOC. GOV'T CODE ANN. § 9.004(a) (West 2008). The record does not include the petition, but it does include copies of the notices publicizing the election.

The full text of the *measure* is as follows:

CHARTER AMENDMENT - PROPOSITION 1

**[Relating to the Creation of a Dedicated Funding Source to Enhance, Improve and Renew Drainage Systems and Streets]**

The City Charter of the City of Houston shall be amended by adding a new Section 22 to Article IX to read as follows:

**"Section 22. Dedicated Pay-As-You-Go Fund for Drainage and Streets.**

To provide for the enhancement, improvement and ongoing renewal

of Houston's drainage and streets, a dedicated, pay-as-you-go fund entitled the 'Dedicated Drainage and Street Renewal Fund' shall be established, applied and funded as follows:

(a)     The Dedicated Drainage and Street Renewal Fund shall be established as a dedicated, pay-as-you-go source of funding for the City's drainage and streets.

(b)     To ensure the continued availability of the Dedicated Drainage and Street Renewal Fund as a pay-as-you-go source for the capital cost of future drainage and street needs, no more than 25% of each annual appropriation to the Fund may be used for maintenance and operation expenses, except where third[-]party contracts, grants or payments may provide otherwise.  The balance shall be used exclusively on a pay-as-you-go basis for capital costs of drainage and streets, including planning, engineering and right-of-way acquisition.  The Fund may not be used to pay debt service.  Beginning in the budget for fiscal year 2012, the Dedicated Drainage and Street Renewal Fund shall be funded annually in each budget adopted by the city council from the following sources, the first two of which are intended to supplement and not replace historic funding sources and the third and fourth of which are intended to confirm the City's commitment to continue historic funding:

   (i)     All proceeds of developer[-]impact fees, which beginning in fiscal year 2012, and continuing thereafter shall be imposed in an equitable manner as provided by law to recover allocable costs of providing drainage and streets for properties under development.

   (ii)    All proceeds of drainage charges, which beginning in fiscal year 2012, and continuing thereafter shall be imposed in an equitable manner as provided by law to recover allocable costs of providing drainage to benefitting properties, with drainage charges initially set at levels designed to generate at least $125 million for fiscal year 2012.

   (iii)   An amount equivalent to proceeds from $0.118 of the City's ad valorem tax levy minus an amount equal to debt service for drainage and streets for any outstanding bonds or notes:

3

(A)	Issued prior to December 31, 2011, and

(B)	Bonds or notes issued to refund them.

(iv)	All proceeds from third[-]party contracts, grants or payments of any kind earmarked or dedicated to drainage or streets.

(c)	This Section is subject to modification as permitted by law or termination at the end of fiscal year 2031 (i.e., after 20 years of operation) if during fiscal year 2030 (i.e. 19th year of operation) such modification or termination is authorized by an affirmative vote of two-thirds of the City Council following a public hearing on the matter.  If not so terminated, this Section shall continue in full force and effect for successive 20[-]year periods, subject in each case to modification or termination in the same manner.

(d)	Funding for the Dedicated Drainage and Street Renewal Fund that is not derived from ad valorem taxes levied by the City (i.e., that portion derived from fees, charges and third[-]party payments) shall not be included in those revenues limited by this Charter.”

The measure was submitted on the ballot as the following *proposition*:

City of Houston
PROPOSITION NO. 1
CHARTER AMENDMENT PROPOSITION

Relating to the Creation of a Dedicated Funding Source to Enhance, Improve and Renew Drainage Systems and Streets.

Shall the City Charter of the City of Houston be amended to provide for the enhancement, improvement and ongoing renewal of Houston's drainage and streets by creating a Dedicated Pay-As-You-Go Fund for Drainage and Streets?

This text was followed by boxes labeled "For" and "Against."  The City canvassed the results of the election on November 15, 2010.  Of the 398,337 people who voted in the election, 174,080 voted for the measure and 166,867 voted against it.

4

## A.    The Election Contest

Allen Mark Dacus, Elizabeth C. Perez, and Rev. Robert Jefferson ["the contestants"] filed an election contest against the City of Houston and its mayor, the Honorable Annise D. Parker (collectively, "the City"), and sought a declaration "stating that [the measure] is illegal and invalid as a matter of law."   They contested the election on the grounds, first, that the City used misleading language in the proposition submitting the measure to voters, and second, that the proposition and measure violate a statute prohibiting the use of a single charter amendment to address more than one subject.

The City moved for traditional summary judgment, and the trial court sent copies of the signed order granting the motion to the parties' counsel.   In the order, the trial court did not state the grounds on which the motion was granted, but instead stated only that "the Court is of the opinion that the Motion for Summary Judgment should be granted, and it is therefore ORDERED that the Motion for Summary Judgment filed herein by Movants is hereby in all things GRANTED.   All relief requested by the Contestants is DENIED." The order was accompanied by a cover letter in which the trial court stated as follows:

> The ballot should contain a description of the measure in such language as to constitute a fair portrayal of its chief features in words of plain meaning so that it can be understood by persons entitled to vote.   Using this statement as a guide, my first impression was that the ballot language in the present case was in fact misleading. It was my belief that the proposal voted on by the people of Harris County[1] authorized the city to assess a drainage fee to help in financing the street and drainage work, and without approval by the voters, such fee could not be imposed.   It was my opinion that the wording in the legal notice published in the newspaper was not adequate to advise the voters that they were in fact voting to assess their property with a drainage fee.
>
> I have learned that [the measure] did not authorize the assessment of a drainage fee, as that had been authorized by state law in Sec. 552.047 of the Local Government Code, and the failure to include the drainage fee assessment in the wording of the ballot was in fact not misleading.

---

[1] The measure actually was submitted to voters residing in the City of Houston.

The Court finds that the wording of the ballot as a whole was not misleading, and that the other matters urged to set aside the results of the election should be denied.

## B.  Motion for New Trial

The contestants filed a motion for new trial in which they argued that the trial court erred in considering the effect of section 552.047 of the Local Government Code because the City did not rely on the statute, which was not relevant to the issues.  *See* TEX. LOC. GOV'T CODE ANN. § 552.047 (West Supp. 2011) (authorizing municipalities to charge for drainage service).  In the alternative, they asked the trial court to sign a judgment *nunc pro tunc* specifying that the summary-judgment motion was granted based on this statute.

In a supplement to their new-trial motion, the contestants additionally asked the trial court to reverse based on newly discovered evidence.  Specifically, they cited a document entitled "Proposed Principles that the Administration Will Use to Implement Proposition 1 If Passed," which was posted on the City's website.  In the document, the City included an example of a drainage-fee calculation.  The example was based on a "typical" lot size of 5,000 square feet and in which 1,900 square feet of the lot were impervious to water.  Given these measurements, the "typical" homeowner's drainage fee was calculated to be $5.07 per month.  The contestants produced evidence that in June 2011, after summary judgment was granted in this case, Mayor Parker stated that although the calculations in the example were accurate, lot sizes were larger than previously assumed, so "[t]he typical example we used may have given the wrong impression to the voters and to Council," because the "typical" monthly drainage fee would be "closer to $8.25."  At a press conference on June 8, 2011, Parker was asked if the election results would have been different if a different example had been used.  She responded,

> I understand that the Prop One proponents used our example, but I don't know what the outcome would have been.  We offered modifiers and disclaimers every time we used that example and said, you know, "Depending on your own lot size and your impervious cover, your amount will differ.  Here's how to do the math."  In fact, we even directed people to

6

[the Harris County Appraisal District] and told them how to find the data so that they could do their own analysis. But I understand that it doesn't matter how many times that we said, you know, "This is an example; do your own calculations," what voters heard was, "it's going to be five dollars." I believe voters should get what they thought they were voting for, but that may be difficult to accomplish. It's certainly not something I can accomplish on my own. We're going to have to analyze what our options are in that, but at this point, we are moving forward with implementing what the voters told us to implement.

In a reply to the City's response to the supplemental motion, the contestants further argued that voters were misled because the "Proposed Principles" document contains a statement that if the measure passed, the City would grant only those drainage-fee exemptions that are required by state law.

The trial court denied the motion for new trial in open court, and the contestants filed this appeal. In three issues, they contend that the trial court erred in granting the City's motion for traditional summary judgment, and in a fourth issue, they argue that the trial court abused its discretion in denying their motion for new trial.

### III. ANALYSIS

We review summary judgments de novo, considering the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if a reasonable factfinder could do so and disregarding contrary evidence unless a reasonable factfinder could not. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).[2] The movant

---

[2] In an appeal of an election contest, the trial court's judgment most often is reviewed for abuse of discretion. *See, e.g.*, *Harrison v. Stanley*, 193 S.W.3d 581, 583 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *Reese v. Duncan*, 80 S.W.3d 650, 655 (Tex. App.—Dallas 2002, pet. denied); *Rossano v. Townsend*, 9 S.W.3d 357, 361 (Tex. App.—Houston [14th Dist.] 1999, no pet.). As we explained in *Brown v. Blum*, however, when a contestant complains about a proposition's language, we apply the de novo standard of review in an appeal of a summary judgment on the issue. 9 S.W.3d 840, 848 & n.9 (Tex. App.—Houston [14th Dist.] 1999, pet. dism'd w.o.j.). *See also Pryor v. Dolgener*, 324 S.W.3d 178, 179 (Tex. App.—El Paso 2010, pet. dism'd w.o.j.) (applying a de novo standard of review to a summary judgment in an election contest).

for traditional summary judgment bears the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). We must affirm the summary judgment if any of the movant's theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). A defendant who moves for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller*, 168 S.W.3d at 816. A trial court is authorized to grant a motion for summary judgment only on the grounds expressly presented. *Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 609 & n.7 (Tex. 2012); *see also* TEX. R. CIV. P. 166a(c) ("The motion for summary judgment shall state the specific grounds therefor."); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) ("[A] motion for summary judgment must itself expressly present the grounds upon which it is made. A motion must stand or fall on the grounds expressly presented in the motion."). Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *See Kerlin v. Arias*, 274 S.W.3d 666, 668 (per curiam) (citing *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995)).

## A. The trial court did not grant summary judgment on a ground not contained in the City's summary-judgment motion.

We begin our analysis with the contestants' third issue, in which they argue that the trial court ruled in the City's favor by improperly relying on a ground not raised in the City's summary-judgment motion.

In its order, the trial court stated without elaboration that the motion "is in all things granted." Although we acknowledge that the trial court purported to state a "finding" in

8

its letter,[3] we cannot consider summary-judgment "findings" or reasons for summary judgment that are stated only in an order's accompanying cover letter. *See Linwood v. NCNB Tex.*, 885 S.W.2d 102, 103 (Tex. 1994) ("[F]indings of fact and conclusions of law have no place in a summary judgment proceeding . . . ."); *RRR Farms, Ltd. v. Am. Horse Protection Ass'n, Inc.*, 957 S.W.2d 121, 126 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) ("A letter is not the proper method for apprising the parties of the grounds for the granting of a summary judgment."). We point out, however, that the trial court could and did consider the argument that it granted summary judgment on an improper basis. Specifically, the contestants argued in their motion for new trial that "the Court erred when it granted the Motion for Summary Judgment in light of Section 552.047 of the Texas Local Government Code, because the Contestees did not rely on or make any arguments on that section in support of their motion." As an alternative to a new trial, the contestants asked the trial court to sign a summary judgment *nunc pro tunc* to clarify that it granted judgment "in light of the effect of Section 552.047." The trial court knew the basis on which it granted summary judgment, and it was not persuaded by the contestants' argument that the ruling was made on a ground that was not raised in the City's summary-judgment motion. The implied rejection of this argument is consistent with our presumption that the trial court granted summary judgment based on the grounds actually raised in the summary-judgment motion.

We accordingly overrule the contestants' third issue. Because the trial court did not identify in the summary-judgment order the grounds on which the ruling was based, we will affirm the judgment if it is supported by any of the grounds presented in the City's summary-judgment motion. *See Provident Life & Accident Ins. Co.*, 128 S.W.3d at 216.

---

[3] *See* section II.A., *supra* ("The Court finds that the wording of the ballot as a whole was not misleading, and that the other matters urged to set aside the results of the election should be denied.").

9

## B.      The proposition was not misleading.

In their first issue, the contestants assert that the trial court erred in granting summary judgment because the City failed to establish as a matter of law that the proposition was not misleading. To place their arguments in context, we begin with a brief overview of the governing law.

By statute, and "[e]xcept as otherwise provided by law, the authority ordering the election shall prescribe the wording of a proposition that is to appear on the ballot." Act of May 13, 1985, 69th Leg., R.S., ch. 211, § 1, 1985 TEX. GEN. LAWS 801, 871 (amended 2011) (current version at TEX. ELEC. CODE ANN. § 52.072 (West Supp. 2011)). A proposition need not contain the full text of the measure under consideration. *See Brown v. Blum*, 9 S.W.3d 840, 847 (Tex. App.—Houston [14th Dist.] 1999, pet. dism'd w.o.j.) (citing *Reynolds Land & Cattle Co. v. McCabe*, 72 Tex. 57, 59–60, 12 S.W. 165, 165 (1888)). Instead, it has long been the rule that "the language of the proposition submitted is not material, provided it substantially submits the question which the law authorizes with such definiteness and certainty that the voters are not misled." *Reynolds*, 72 Tex. at 59–60, 12 S.W. at 165; *accord*, *Blum v. Lanier*, 997 S.W.2d 259, 262 (Tex. 1999). "The ballot should contain a description of the [measure] submitted in such language as to constitute a fair portrayal of the chief features of the [measure], in words of plain meaning, so that it can be understood by persons entitled to vote." *Wright v. Bd. of Trustees of Tatum Indep. Sch. Dist.*, 520 S.W.2d 787, 792 (Tex. Civ. App.—Tyler 1975, writ dism'd).

Courts have never interpreted this reference to a measure's "chief features" to include everything about the measure that may influence an individual's vote; such a task could not be accomplished without reproducing the full text of the measure to be decided—and perhaps not even then.[4] We instead presume that by the time voters have entered the polling place, they already are familiar with the measure. *Hill v. Evans*, 414

---

[4] In fact, counsel for contestants stated at oral argument before this court that even if the entire measure had been printed verbatim on the ballot, the proposition still would have been misleading.

10

S.W.2d 684, 692 (Tex. Civ. App.—Austin 1967, writ ref'd n.r.e.). Such a presumption is justified because publication of the measure as required by law constitutes notice to the voters of its contents. *See id.* at 693. *See also R.R. Comm'n v. Sterling Oil & Ref. Co.*, 147 Tex. 547, 553, 218 S.W.2d 415, 418 (1949) ("[Pre-election publication] is done to identify the amendment and to show its character and purposes, so that the voters will be familiar with the amendment and its purposes when they cast their ballots."). Thus, the language chosen to submit the measure to the voters is "sufficient if enough is printed on the ballot to identify the matter and show its character and purpose." *Wright*, 520 S.W.2d at 792. When the voters have been notified of the measure's contents, a proposition "adequately describes a proposed amendment if it gives fair notice to the voter of average intelligence by directing him to the amendment so that he can discern its identity and distinguish it from other propositions on the ballot." *Hardy v. Hannah*, 849 S.W.2d 355, 358 (Tex. App.—Austin 1992, writ denied).

In their pleadings, the contestants quote this very language from *Hardy*, acknowledging that a proposition is sufficient if it permits the voter to identify the measure and distinguish the proposition submitting it from the other propositions on the ballot. They contend that the proposition at issue failed this test because it "[did] not accurately describe the object and effect of [the measure], causing the voters to be intentionally misled."

### 1. *The City met its initial burden to establish, as a matter of law, that the proposition was not misleading.*

In support of its summary-judgment motion, the City produced evidence that notices of the election to be held on November 2, 2010 were posted at City Hall on October 12, 2010 and were published in the newspaper on October 17, 2010 and October 24, 2010. By publishing this material, which included the full text of the proposed amendment and an estimate of its anticipated fiscal impact, the City notified voters of the measure's contents. *See* TEX. LOC. GOV'T CODE ANN. § 9.004(c) (West 2008) (governing notice to voters of

11

proposed amendments to a home-rule municipality's charter). "When the ballot has directed the attention of the voter to an amendment with which he is presumed to be familiar, the ballot has given fair notice." *Hill*, 414 S.W.2d at 692.

The City satisfied its initial burden to establish that the proposition satisfied such common-law requirements. By its express terms, the measure is one "Relating to the Creation of a Dedicated Funding Source to Enhance, Improve and Renew Drainage Systems and Streets." This language was repeated verbatim in the proposition. The measure's character is that of a proposed amendment to the City's charter, and its purpose is stated in its opening paragraph as follows: "To provide for the enhancement, improvement and ongoing renewal of Houston's drainage and streets, a dedicated, pay-as-you-go fund entitled the 'Dedicated Drainage and Street Renewal Fund' shall be established, applied and funded . . . ." The measure's character and purpose were accurately stated in the proposition, in which voters were asked, "Shall the City Charter of the City of Houston be amended to provide for the enhancement, improvement and ongoing renewal of Houston's drainage and streets by creating a Dedicated Pay-As-You-Go Fund for Drainage and Streets?" This language was taken directly from the measure and permitted voters to distinguish this proposition, which concerned only the dedicated pay-as-you-go fund, from the other two propositions on the ballot.[5]

The contestants argue that the City cited no authority that the trial court was limited to reviewing only the language of the proposition, and that a trial court should "look at all

---

[5] In Proposition 2, "Relating to Residency Requirements for District Council Office for the November 2011 General Election," voters were asked,

Shall the City Charter of the City of Houston be amended to provide that for the general election to be held in November 2011, and for the purpose of redistricting, the required period of residency to file for the office of District Council Member shall be reduced from 12 months to 6 months preceding the election day?

In Proposition 3, "An Amendment to the City Charter Relating to the Use of Photographic Traffic Signal Enforcement Systems (Red Light Cameras)," voters were asked, "Shall the City of Houston continue to use red light cameras to enforce state or local laws relating to traffic safety?"

12

the facts and circumstances surrounding submission to ascertain whether fair notice was given by the ballot." *See Hill*, 414 S.W.2d at 693. But, the City has never argued that the trial court is limited to reviewing the proposition, and instead has relied on evidence of the circumstances surrounding the submission of the measure to the voters. One such key circumstance is whether "the City also published the full text of the proposed charter amendment prior to the election." *Brown*, 9 S.W.3d at 851. The City produced uncontroverted evidence that it did so. Under such circumstances, voters could not be misled by the proposition's use of the same language used in the measure at issue. Finally, the contestants concede that the voters could tell the difference between the three propositions on the ballot.

### 2. *The contestants failed to raise a genuine issue of material fact.*

The contestants also assert that they responded to the summary-judgment motion with evidence raising a question of fact as to whether the proposition was misleading. Their evidence consists of an affidavit from one voter, the results of a telephone survey, and an affidavit from the expert who conducted the telephone survey. The voter, Elena B. Peden, attested that she voted for the measure, but would not have done so if she had known that (a) "The City Council could exempt selected groups of people from the assessment, such as churches or school districts"; (b) "The City Council would decide how the money will be generated to pay for the enhanced, improved and renewed drainage systems and streets"; and (c) the measure "includes a mandatory minimum annual funding of $125 million a year, without any cap on funding or rate." She therefore concluded that the proposition was misleading because it did not "adequately describe" these "chief features." The contestants' expert Michael Baselice conducted a telephone survey in which respondents "were provided specific information about [the measure] that was not part of the [proposition]" and asked if they would have voted for the measure if they had known this material. The "specific information" that Baselice provided to survey respondents was similar to the "facts" cited by Peden in her affidavit. Survey respondents

13

were told the following three things: (1) the measure "included dedicated funding of 125 million dollars per year"; (2) the measure "did not indicate who will pay for the enhanced, improved and renewed drainage systems and streets and that [sic] the Houston City Council would decide how the money would be generated to pay for it"; and (3) after the measure's passage, "the Houston City Council could exempt selected groups or people from the assessment, such as churches or school districts, leaving those who are not exempt paying for the entire assessment." Baselice concluded that the proposition was misleading because many survey respondents indicated that they would have voted differently based on these statements.

In arguing that this evidence raised a genuine issue of material fact as to whether the City used misleading language in the proposition submitting the measure to voters, the contestants assert that the statements referred to by Peden as "facts" and by Baselice as "specific information about [the measure]" are the measure's "chief features." This is incorrect. The measure's "chief features" are those that allow a voter to identify the measure's character and purpose, and to distinguish the proposition submitting the measure from the other propositions on the ballot. *See Wright*, 520 S.W.2d at 792; *Hardy*, 849 S.W.2d at 358. As a matter of law, the assertions made by Peden and Baselice about the measure cannot be the measure's "chief features" because they are not in the measure at all. First, the measure contains no mention of exemptions. Second, the measure does not provide that City Council will decide how the money for the fund will be generated; it provides that the money to be allocated to the fund is to be drawn from four identified sources. And third, the measure does not impose a requirement that $125 million be allocated to the fund annually; it imposes a minimum level of funding only for fiscal year 2012. The contestants admit that the material that they characterize as the measure's "chief features" are not in the measure at all; thus, they stated in their brief that their summary-judgment evidence established that "voters would have voted differently had the ballot *and related notices* described three chief features about the measure, none of which

14

were included in the ballot *or legal notices*"[6]—even though, as we have pointed out, the notices contained the measure's entire text.

The contestants' true complaint is not that the proposition on the ballot misled voters about the measure's contents; their complaint is that the measure itself was misleading. For example, they assert that voters were misled because the proposition identified the measure as one concerning the creation of a "pay-as-you-go" fund. But because these are the exact words used in the measure, the use of the same language in the proposition cannot have misled the voters. The contestants assert that the common meaning of the expression "pay-as-you-go" is inconsistent with the way in which the dedicated fund actually has been funded and implemented, but that is not the proper inquiry in an election contest. *See* TEX. ELEC. CODE ANN. § 221.003 (West 2010) (setting forth the scope of an election contest). "An election contest is a special proceeding created by the Legislature to provide a remedy for elections tainted by fraud, illegality or other irregularity." *Blum*, 997 S.W.2d at 262. In such a proceeding, "a district court's authority to act is limited to the subjects or grounds expressly or impliedly authorized by the Election Code." *Rossano v. Townsend*, 9 S.W.3d 357, 362 (Tex. App.—Houston [14th Dist.] 1999, no pet.). An election contest does not encompass a complaint about the way in which the City implemented the measure that voters actually passed. *Hotze v. White*, No. 01-08-00016-CV, 2010 WL 1493115, at \*5 (Tex. App.—Houston [1st Dist.] Apr. 15, 2010, pet. denied) (mem. op.).[7]

In sum, there is no requirement that the proposition's language include matters that the measure's language does not. Because the City established as a matter of law that the

---

[6] Emphasis added.

[7] Moreover, the record does not show that the contestants have standing to litigate such a challenge. *See Brown v. Todd*, 53 S.W.3d 297, 302 (Tex. 2001) ("No Texas court has ever recognized that a plaintiff's status as a voter, without more, confers standing to challenge the lawfulness of governmental acts. Our decisions have always required a plaintiff to allege some injury distinct from that sustained by the public at large.").

15

language used in the proposition submitting the measure to voters was not misleading, we overrule the contestants' first issue.

**C.      The proposition does not impermissibly address more than one subject.**

In their second issue, the contestants assert that the City failed to prove as a matter of law that the proposition does not address two subjects in violation of section 9.004(d) of the Texas Local Government Code. *See* TEX. LOC. GOV'T CODE ANN. § 9.004(d) ("An amendment [to a home-rule municipality's charter] may not contain more than one subject."). In moving for summary judgment, the City presented two reasons for concluding that the measure—and hence, the proposition submitting the measure to voters—did not violate section 9.004(d). First, the City asserted that the measure's only subject was the single, dedicated fund it described, even though the fund supports improvements to both streets and drainage. *See Garitty v. Halbert*, 235 S.W. 231, 236 (Tex. Civ. App.—Dallas 1921, writ dism'd w.o.j.) (explaining that the proposed amendment of two sections of the city's charter dealt with the single subject of taxation, even though the funds raised thereby would be apportioned both to maintaining schools and to establishing and maintaining libraries). Second, the City asserted that streets and drainage are both concerned with the single subject of storm-water flow. *See Gibson v. City of Orange*, 272 S.W.2d 789, 789–90 (Tex. App.—Beaumont 1954, writ ref'd) (holding that a proposition submitting the proposed repeal of one article of the city's charter and the proposed amendment of five more articles all addressed the single subject of changing to a city-manager form of government).

Because the trial court did not specify the grounds on which it granted summary judgment, we must affirm the judgment on this claim if either of these grounds is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). Both at trial and on appeal, the contestants argued that streets and drainage are different subjects, but did not challenge the City's contention that the proposition, like the measure, addresses only the single subject of the dedicated pay-as-you-go fund. This ground

16

supports summary judgment on the contestants' claim concerning the alleged violation of section 9.004(d). *See Garitty*, 235 S.W. at 236. We therefore overrule their second issue.

**D. The trial court did not err in failing to grant the contestants' motion for new trial on the basis of newly discovered evidence.**

Finally, the contestants argue in their fourth issue that the trial court erred in failing to order a new trial based on newly discovered evidence. To prevail on such grounds, movants must establish that (1) they learned of the evidence since the trial, (2) their failure to learn of the evidence sooner was not due to their lack of diligence, (3) the evidence is not cumulative, and (4) the evidence "is so material that it would probably produce a different result if a new trial were granted." *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex. 1983), *overruled on other grounds*, *Moritz v. Preiss*, 121 S.W.3d 715, 721 (Tex. 2003). We review the denial of a motion for new trial for abuse of discretion. *In re R.R.*, 209 S.W.3d 112, 114 (Tex. 2006) (per curiam). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003).

In the supplement to their motion for new trial, the contestants cited statements by Mayor Parker about an example of a drainage-fee calculation for a residential property. In "Proposed Principles that the Administration Will Use to Implement Proposition 1 If Passed," the City proposed to assess drainage fees based on the size of the "hard areas," that is, based on the impervious surface area such as that covered by the ground floor of a house, garage, and driveway. Under this proposal, the City would assess annual drainage fees for residential properties located on streets with curbs and gutters at the rate of $.032 per square foot of such "hard areas." In the cited example, the City listed a "[t]ypical lot size" of 5,000 square feet, and a "[t]ypical house ground floor/garage/driveway" area of 1,900 square feet. Based on these measurements, the expected monthly drainage fee for such a property was $5.07. In June 2011, however, Mayor Parker stated that "we picked a bad example" because the median residential lot size is larger than the lot referred to as

17

"typical" in the example. As reported in the newspaper article cited by contestants, the City later concluded, based on satellite imagery and data from the appraisal district, "that the typical Houston home sits on a 7,500-square-foot lot with 2,850 square feet of impervious surface." The contestants also cited evidence that in a letter to the city council, Mayor Parker stated, "I believe the voters deserve the fee they thought they were voting for." A week after this letter, Mayor Parker announced that the City would "adjust drainage fees for every property owner in the City of Houston so that the drainage fees that voters expected to receive when they faced this item on the ballot last November are actually the fees that they will be paying moving into the future."

The contestants characterize these and similar statements as admissions, and argue that Mayor Parker misled voters by suggesting that the owner of a typical home in Houston would pay a $5.00 monthly drainage fee if the measure passed. But, neither the measure nor the proposition contained any estimates of the drainage fee that a typical homeowner would be assessed. Thus, none of this evidence bears on the question of whether voters were misled by the proposition submitting the measure to voters.

In a similar argument, the contestants maintain that voters additionally were misled about who would be exempt from the drainage fee. This argument also relied on the "Proposed Principles That the Administration Will Use to Implement Proposition 1." The contestants complain that the City stated in the "proposed principles" document that the only exemptions from drainage fees would be those exemptions required by state law, but later passed a drainage-fee ordinance from which school districts and religious organizations are exempt. Under state law, such exemptions are permitted, but are not required. *See* TEX. LOC. GOV'T CODE ANN. § 552.053(b),(d) (West Supp. 2011).

None of the newly discovered evidence cited by the contestants was material to the issues that actually were pleaded and tried in this election contest. *See* TEX. ELEC. CODE ANN. § 221.003 (setting forth the scope of inquiry in an election contest). The contestants' complaint that the City failed to adhere to its "proposed principles" is not a

18

challenge to the elective process, but is instead a complaint about the way in which the City implemented the measure that voters actually passed. *See Hotze*, No. 01-08-00016-CV, 2010 WL 1493115, at *5. Because these complaints are beyond the scope of an election contest, the trial court did not abuse its discretion in refusing to grant a new trial on this basis. *See Stelzer v. Huddleston*, 526 S.W.2d 710, 714 (Tex. Civ. App.—Tyler 1975, writ dism'd) (holding that an election contest did not encompass the argument that voters "were misled into believing that only a slight increase of taxes would be necessary to support the bond issue in question"). *See also Nalle v. City of Austin*, 85 Tex. 520, 544–45, 22 S.W. 668, 674–75 (1893) (holding that an election could not be declared void where contestants alleged that the election result was "induced mainly by representations made to the voters," but the measure and proposition did not incorporate those representations, and explaining that "[h]aving a plain proposition submitted to them, the voters must be presumed to know its meaning and effect, and . . . no inquiry as to their motives can be permitted"); *Roberts v. Hall*, 167 S.W.2d 621, 623 (Tex. Civ. App.—Amarillo 1942, no writ) ("It is the law that questions submitted to the voters for determination must be ascertained from the official orders and notices and not from such promises, either oral or written, as are here alleged and relied on.").

We accordingly overrule the contestants' fourth issue.

## IV. CONCLUSION

The City has the duty and the discretion to select the proposition language used in the ballot to submit to the voters the question of whether they are for or against a particular measure. Here, that measure was the amendment of the City's charter to add specific language addressing a single subject. The City had no duty to include in the proposition language that would quantify the measure's impact on a typical homeowner or predict the way in which the measure would be interpreted or implemented if passed. Having notified voters of the measure's complete text by publishing it, the City needed only to refer in the proposition to the measure's character and purpose—its "chief features"—in a

19

way that allowed voters to identify it and distinguish the proposition submitting it from the other propositions on the ballot. Because the City fulfilled that obligation by using plain language drawn from the measure itself, we affirm the trial court's judgment.


/s/ Tracy Christopher
Justice


Panel consists of Chief Justice Hedges and Justices Christopher and Jamison.